Harry ZYCH, d/b/a American Diving and Salvage Co., Plaintiff,

v.

The UNIDENTIFIED, WRECKED AND ABANDONED VESSEL, BELIEVED TO BE THE SB "LADY ELGIN," Defendant.

No. 89 C 6501.

United States District Court, N.D. Illinois, E.D.

Dec. 4, 1990.

As Modified Jan. 4, 1991.

Paul N. Keller, Park Ridge, Ill., Lenore E. McQuilling, Walker & Corsa, New York City, for plaintiff.

James R. Carroll, William K. Kane, Asst. Atty. Gen., Gen. Law Div., Chicago, Ill., Linda A. Wawzenski, Asst. U.S. Atty., for defendant.

David A. Doheny, Andrea C. Ferster, Thompson M. Mayes, Elizabeth S. Merritt, Nat. Trust for Historic Preserv., Washington, D.C., for Nat. Trust for Historic Preservation in the U.S.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This admiralty action commenced on August 28, 1989, when plaintiff Harry Zych, doing business as American Diving and Salvage Co., filed an in rem complaint against a shipwreck located in Lake Michigan and believed to be the "Lady Elgin." The complaint asserted that the ship was abandoned and that he was the rightful owner pursuant to the law of finds. The Court issued a warrant for arrest of the vessel on August 28.

Subsequently, the Illinois Department of Transportation and the Illinois Historic Preservation Society (collectively, "the State") moved to intervene for the limited purpose of moving to dismiss on the basis of the State's immunity pursuant to the

Eleventh Amendment of the U.S. Constitution. During the briefing of that motion, Zych and others formed the Lady Elgin Foundation ("the Foundation"). The Foundation intervened on May 3, 1990, asserting that it had become the owner of the shipwreck pursuant to an agreement with CIGNA Property & Casualty Insurance Co., which had originally insured the vessel and her cargo. The Foundation also sought leave to file its claim and an answer to the complaint.

On September 13, 1990, the Court granted the State's motion to dismiss on the ground of immunity. *Zych v. Lady Elgin*, 746 F.Supp. 1334 (N.D.Ill.1990). Because there remained an apparent dispute between Zych and the Foundation over ownership of the vessel, the Court did not dismiss the case in its entirety. However, the Court expressed concerns as to whether there was a case or controversy, and it directed Zych and the Foundation (both of whom were represented by the same attorney) to file reports showing why the case should not be dismissed in its entirety. 746 F.Supp. at 1351 n. 16.

After receiving the parties' submissions, the Court granted the Foundation leave to file its claim and answer on the condition that it retain independent counsel and that plaintiff pursue his adverse claim of title. The Court also set a briefing schedule for dispositive motions. The parties have filed memoranda concerning the merits of the Foundation's claim, and that issue is now pending.

## II. OWNERSHIP

The Foundation asserts that the Aetna Insurance Co. became the owner of the shipwreck when, in 1860, it paid out $11,993.20 on the loss pursuant to an insurance contract covering the vessel and her cargo. In April of 1990, the Foundation executed an agreement with CIGNA, the successor of Aetna. Pursuant to that agreement, CIGNA transferred its ownership interest in the shipwreck to the Foundation in exchange for twenty percent of the gross proceeds of the sale of any property or artifacts from the shipwreck. Accordingly, the Foundation contends that it now has title to the wreck.

■ Zych asserts title pursuant to the law of finds. The law of finds awards title of abandoned property to the first finder who takes possession of the property with intent to exercise control over it. *See generally Zych*, 746 F.Supp. at 1343. Zych concedes the facts alleged by the Foundation but argues that CIGNA abandoned the vessel. The sole dispute between Zych and the Foundation is whether the vessel has been abandoned.

■ Abandonment is the voluntary relinquishment of one's rights in a property. *Mucha v. King*, 792 F.2d 602, 610 (7th Cir.1986). It occurs "by an express or implied act of leaving or deserting property without hope of recovering it and without the intention of returning to it." *Columbus–America Discovery Group, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 742 F.Supp. 1327, 1335 (E.D.Va.1990), quoting 3A *Benedict on Admiralty* § 134 (7th ed. 1980). It must be voluntary, with a positive intent to part with ownership, and without coercion or pressure. *Katsaris v. United States*, 684 F.2d 758, 762 (11th Cir.1982).

■ To show abandonment, a party must prove (1) intent to abandon, and (2) physical acts carrying that intent into effect. *Chemical Sales Co. v. Diamond Chemical Co.*, 766 F.2d 364, 368 (8th Cir. 1985); *Columbus–America*, 742 F.Supp. at 1335; *Hoelzer v. City of Stamford*, 722 F.Supp. 1106, 1111 (S.D.N.Y.1989); *State of Idaho v. Oregon Short Line Railroad Co.*, 617 F.Supp. 213, 217 (D.Idaho 1985). Abandonment may be inferred from all of the relevant facts and circumstances. *United States v. Sylvester*, 848 F.2d 520, 525 (5th Cir.1988); *Katsaris*, 684 F.2d at 762; *Columbus–America*, 742 F.Supp. at 1335. A finding of abandonment must be supported by strong and convincing evidence, *Chemical Sales*, 766 F.2d at 368, but it may, and often must, be determined on the basis of circumstantial evidence. *Katsaris*, 684 F.2d at 762; *Columbus–America*, 742 F.Supp. at 1343.

■ The Foundation has submitted a number of documents and affidavits in support of its claim. The Foundation relies heavily on the affidavit of Ivan Avery, an expert in insurance archival matters and an officer of a subsidiary of CIGNA. Avery reviewed a Letter Book containing correspondence from July 23, 1860, through March 5, 1861, and found six letters relating to the Lady Elgin wreck. He notes that the Letter Book would only have contained the most significant correspondence due to the difficulty and expense of copying documents at that time.

The first document is a letter dated September 11, 1860, from Thomas Alexander, an officer of Aetna, to Gordon Hubbard and a Mr. Hunt. Hubbard was an agent of Aetna and also owned the Lady Elgin, and Hunt was his partner. In the letter, Alexander states that he has been informed of the loss and expresses hope that the company will escape claims on the cargo.

Also on September 11, 1860, Alexander wrote to Captain E.P. Dorr, the surviving captain of the Lady Elgin, inquiring as to ongoing litigation against the owners of the schooner Augusta, which had caused the Lady Elgin to sink by ramming her during a storm.

On September 13, 1860, Aetna President E.G. Ripley wrote to J.B. Bennett, an Aetna agent based in Cincinnati. He noted that the Aetna policies applicable to the Lady Elgin were for $5000 for the hull and $2500 for the cargo. Ripley wrote to Hubbard and Hunt on September 22, 1860, instructing them to pay on the Lady Elgin claims as soon as possible upon the receipt of invoices.

On October 10, 1860, Alexander wrote again to Hubbard and Hunt. After an apparent discussion of the interest on the claim, he writes, "permit us to confirm Capt. Dorr instructions not to accept an abandonment of the vessel, for the reason which he informs us he gave you on his recent visit to Chicago."

The final document is a letter from Alexander to Hubbard and Hunt on November 15, 1860, noting the payment of $11,993.20 to Hubbard "in full of policy on Lady Elgin."

The Foundation also submits the affidavit of Christopher Parson, its Executive Director. Parson states that the Lady Elgin has been the subject of intensive search efforts by a number of prominent salvors and underwater explorers as well as many less organized efforts by sport divers. Parson also describes the search methods which were used in conducting both Zych's earlier, unsuccessful efforts to locate the wreck and those used in his recent, successful effort. Because of the location of the wreck, in very deep water and spread out among boulders and large stones in the lake bed, the wreck could not have been found without the state-of-the-art technology which Zych used to discover the wreck and which was not available until the late 1980's.

Zych does not dispute the facts asserted by the Foundation based on this evidence. In fact, the parties have stipulated that the documents show that Aetna insured the Lady Elgin's hull and cargo, that Aetna received claims and supporting documentation for the loss, that Aetna paid the claims in full for $11,993.20, and that Aetna instructed its agents not to abandon the Lady Elgin. Zych also concedes that Aetna acquired title to the Lady Elgin by subrogation. However, Zych disputes the legal significance of these facts. He argues that Aetna abandoned the wreck through the lapse of time and the failure to take any steps to recover the vessel. *See Wiggins v. 1100 Tons of Marble*, 186 F.Supp. 452, 456 (E.D.Va.1960) (although lapse of time and "nonuser" are not sufficient in themselves to constitute abandonment, they did imply an intent to abandon when considered along with the failure to conduct sufficient efforts to recover the property).

The only reported case which the Court and the parties have been able to locate in which an insurer has asserted title to a shipwreck is *Columbus–America*. In that case, the court determined that the insurance companies had abandoned a vessel which was wrecked in 1857. The insurers had submitted, as proof of ownership,

newspaper articles from the time of the wreck which indicated that the insurers stated they would pay the claims upon presentation of proper proof. 742 F.Supp. at 1344. The court assumed that payments had actually been made in accord with this intent. *Id.* However, the court emphasized that it had not been provided with the types of documents it would expect were involved in the transactions, such as an invoice, a bill of lading, a draft or bill of exchange evidencing the payment itself, and an insurance certificate. *Id.* The court then stated:

> The insurance carriers destroyed their records relating to the events of the Central America. Exactly when is not shown, but evidence establishes it was their custom to keep records for some five year periods, and thereafter destroy them. However, one expert on marine insurance testified that if a company intended to assert its right to subrogation, it always maintained its documents of proof of the claim and that it had paid the claim, and the fact it disposed of such documents was an indication it abandoned its claim. It is difficult to believe that a company claiming an asset or property worth $150,000.00 in the 1800's or even early 1900's would destroy all evidence of its claim if it had any intention to pursue it, or any hope of recovery. How could one better demonstrate their intention to abandon a claim to or interest in property than to intentionally destroy every evidence of its claim, right or title thereto.... Their actions speak clearly. They had no hope or idea they could locate the Central America, and even if they located it, they had no hope they could recover anything from it. They destroyed the documents and intended thereby to abandon any claim they might have.

*Id.* at 1344–45. The court also emphasized that the insurers had not joined or assisted in any of several well-publicized expeditions after the technology capable of locating the wreck became available. *Id.* at 1345.

This case, of course, differs from *Columbus–America* in that there is no affirmative act, such as the destruction of documents, which indicates an intent by Aetna to abandon the wreck. Indeed, one of the documents appears to show a specific intent not to abandon it.

There remains, however, the argument that the failure to take any steps to recover the wreck is sufficient evidence of intent to abandon, when considered in light of the lapse of 130 years. The Foundation contends that Aetna's failure to act is inconsequential because the technology has not previously been available to locate the wreck—as evidenced both by the affidavit of Parsons and by the lack of previous success in locating the Lady Elgin despite numerous search efforts. Zych might respond that the lack of late–1980's technology did not dissuade others from attempting to locate the wreck. In light, however, of the law's hesitancy to find abandonment and the concomitant requirement that abandonment be supported by strong and convincing evidence, the Court finds that Aetna was not required to engage in efforts to recover the wreck in order to avoid abandoning its interest when such efforts would have had minimal chances for success.

Zych has not provided sufficient evidence from which a reasonable fact-finder could conclude that Aetna abandoned the wreck of the Lady Elgin. Accordingly, the Court finds that the Foundation's claim to the wreck must be upheld and Zych's claim for ownership must be dismissed.[1]

---

1. Both parties submitted legal memoranda addressing abandonment and the validity of the Foundation's claim. Although neither party entitled its submission a "motion for summary judgment," the memoranda were filed pursuant to the Court's briefing schedule for "dispositive motions" and both parties made arguments based on the undisputed facts. Accordingly, the Court has treated the submissions as cross-motions for summary judgment. Because Zych has the burden of proof to show abandonment and has not submitted sufficient evidence to meet this burden, judgment is properly entered against him on the ownership claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (summary judgment must be entered "against a party who fails to make a showing sufficient to establish

## III. SCOPE OF THE JUDGMENT

■ The Foundation further seeks an order establishing its ownership rights over the wreck as against the State. In determining that the State was immune, the Court found that the action was, in part, against the State because the State had a colorable claim of ownership pursuant to the common law of finds and, alternatively, the Abandoned Shipwreck Act, 43 U.S.C. §§ 2101 *et seq.* Both of these bases for the State's ownership claim rest on the assumption that the vessel has been abandoned. The Foundation reasons that because the Court has now found that the vessel was not abandoned, it is now clear that the State does not have a colorable ownership interest in the vessel. Accordingly, the State is not immune, and the judgment should run against the State along with the rest of the world.

The Foundation's logic makes sense on its face. Ordinarily, in an abundance of caution, the Court would enter a rule to show cause why the judgment should not enter against the State as well, and afford the State an opportunity to respond. However, the State was aware of the Foundation's desire that the judgment run against the State. That desire was expressed in the Foundation's memorandum of November 19, 1990, and was also addressed in Zych's memorandum filed the same date. Both of those memoranda were served upon the State's attorney, William Kane. A hearing was then held in open court on November 26, 1990. With respect to the State, the following colloquy occurred:

THE COURT: ... Now, Mr. Kane, tell me this, does the State intend to take any position in these proceedings?

MR. KANE: No, Your Honor, it's the State's position we are no longer a party before this Court. And your order that was entered I believe on September has been appealed. In fact, the plaintiffs have filed their brief and we'll be responding. So it's our position we are not—not involved in this case any more.

THE COURT: Then what I am going to do is I am going to make a finding on the record that you have waived any further participation in this case.

MR. KANE: That's fine, Your Honor. I think that was our intention. Our intention in this matter was to intervene solely to contest this Court's jurisdiction to enter a finding against the State.

THE COURT: All right.

MR. KANE: And we will continue on that course.

(Transcript of Proceedings, Nov. 26, 1990, at 5–6.) Toward the end of the hearing, after soliciting the remaining parties' views as to how to proceed, the Court asked, "So having heard all that, your position remains the same, Mr. Kane?" Mr. Kane replied, "That's right, Your Honor. Our position remains the same. We are not a party any longer and we are up in the Appellate Court right now." (Transcript at 11.)

The State thus had an opportunity to respond to the Foundation's argument and knowingly waived that opportunity.[2] Accordingly, the Court enters judgment de-

---

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Plaintiff's claim for salvage, however, remains pending.

**2.** The State might argue that it did not wish to take further part in the proceedings because it did not want to waive its immunity. However, the issue here bears directly on whether the State has immunity in the first place. The State does not waive its immunity merely by appearing to assert it. *See Lady Elgin,* 746 F.Supp. at 1350.

It might be asked why the Court decided the immunity question first, before proceeding to the merits of the Foundation's claim, thus run-

ning the risk that the decision on the Foundation's claim would change the immunity analysis. There were several factors that led the Court to proceed the way it did. For instance, it was equally possible that a determination of the immunity issue could have rendered it unnecessary to reach the other issues in the case. Furthermore, at that time it seemed highly unlikely that the Foundation's claim would ultimately succeed. Never before, to the Court's knowledge, had such a claim by an insurer of a shipwrecked vessel succeeded. In the only other case where insurers attempted to make such a claim—the *Columbus–America* case, the insurers had failed.

claring that the Foundation is the sole owner of the shipwrecked Lady Elgin.