John F. MOYER, Plaintiff,

v.

The WRECKED AND ABANDONED
VESSEL, KNOWN AS The ANDREA
DORIA, Defendant.

Civ. A. No. 93–2377.

United States District Court,
D. New Jersey.

Nov. 18, 1993.

1101

Peter E. Hess, Wilmington, DE, for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RODRIGUEZ, District Judge.

Plaintiff requests a preliminary injunction in order to find and salvage certain contents

of the vessel known as The ANDREA DORIA.

It is a case of admiralty and maritime jurisdiction stating a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The court has subject matter jurisdiction of this case pursuant to the United States Constitution, Article III, Section 2, Clause 1, and 28 U.S.C. § 1333. For the reasons set forth below, the plaintiff's motion is granted.

## I. *FINDINGS OF FACT*

1. The defendant vessel, ANDREA DORIA, sank on July 26, 1956, eleven hours after its infamous collision with the Swedish liner STOCKHOLM, in international waters approximately 200 miles due east of Sandy Hook, New Jersey and 50 miles south of Nantucket, Massachusetts.

2. The plaintiff, John F. Moyer of Vineland, New Jersey, is a resident of this district and an experienced ANDREA DORIA diver who has made 56 dives to the defendant shipwreck. He has salvaged hundreds of objects from the wreck, including porcelain, crystal glassware, and brass portholes. In 1985, he assisted in the recovery of a bronze bell from the ship's stern steering station. Moreover, Moyer has accumulated a considerable archive of information and expertise on the ANDREA DORIA, through both extensive correspondence with surviving crew members and his own personal research.

3. On August 13, 1993, this court held a hearing on plaintiff's claim at which Gary Gentile of Philadelphia, Pennsylvania testified. Gentile is an expert and author on maritime history, shipwreck diving and underwater photography. Gentile has made 116 dives on the ANDREA DORIA and has also written an authoritative history of the ANDREA DORIA since its sinking. Gentile's book *ANDREA DORIA; DIVE TO AN ERA* (Gary Gentile Productions 1989); Gary Gentile, (Pl.'s Ex. 1.) details the history of the ANDREA DORIA salvage schemes, the recovery of portions of the vessel's contents, and the recreational exploration and salvage of the sunken luxury liner. Gentile testified that the ANDREA DORIA is considered to be one of the most difficult and challenging

shipwrecks for scuba diving exploration and salvage. Obstacles to diving on the wreck include its great depth (requiring lengthy in-water decompression), strong currents, the danger of entanglement with nets and wreck debris, and poor underwater visibility. Divers also experience disorientation from narcosis caused by the depth and from penetrating and exploring a massive shipwreck lying on its side.

4. Because the ANDREA DORIA is located in seas subject to frequently violent weather, viable salvage operations may be conducted on the shipwreck only during the summer, from mid-June to about mid-August.

5. The location of the shipwreck is well known and has been thoroughly documented. The ship's sinking was recorded in a series of Pulitzer-prize winning photographs taken by Harry Trask of the *Boston Traveler.* The day after the ship's sinking, Peter Gimbel and Joseph Fox became the first divers to descend to the shipwreck and take photographs of the liner lying in 240 feet of cold Atlantic water. (Pl.'s Ex. 1 at 57–58.)

6. Before she sank, the ANDREA DORIA was owned by the Italia Lines, a government-subsidized commercial passenger line. Insurance on the loss of the vessel was paid by the Italian insurance conglomerate, Societa D'Assicurazione, which thereby acquired title to the shipwreck by right of subrogation. (Pl.'s Ex. 1 at 24.)

7. Numerous schemes to raise the ANDREA DORIA were unsuccessfully floated shortly after the liner's sinking:

> The Societa entertained more than a hundred offers for the salvage of the liner, but accepted none. Most would-be salvors wanted to share the cost of salvage. The Societa would not even approve the standard "no cure, no pay" agreement: it wanted cold, hard cash, no future involvement, and no liability. There were no such takers....

(Pl.'s Ex. 1 at 24.)

8. The Societa has never made any effort to conduct salvage operations on its own. Moreover, the Societa has never contested

the ownership of property recovered from the ANDREA DORIA in a succession of open and notorious salvage operations. For example, the 1964 TOP CAT expedition succeeded in recovering the bronze statue of the shipwreck's namesake, the sixteenth-century Admiral Andrea Doria. (Pl.'s Ex. 1 at 33–42.) In 1981, Peter Gimbel led a salvage operation that raised to the surface the ANDREA DORIA purser's safe. The safe, found to contain thousands of notes of water-logged Italian Lira currency, was opened during a live television special that was transmitted to 42 foreign countries. (Pl.'s Ex. 1 at 70–78.)

9. Recreational scuba divers have visited the ANDREA DORIA since approximately 1966. (Pl.'s Ex. at 42–44.) Gentile testified that beginning in the early 1980s, several charter vessels carrying recreational divers have visited the ANDREA DORIA on an annual basis. These scuba divers have collectively salvaged thousands of objects from inside the sunken luxury liner, including porcelain dishes, crystal glassware, silver cutlery, brass portholes, ecclesiastical items, fresco paints, jewelry and shipboard trinkets, navigational equipment and the ship's stern bell. No challenge has ever been made to the divers' right of possession or ownership of the objects which they have recovered.

10. Several years ago, the plaintiff, John F. Moyer, began planning an expedition to recover the ANDREA DORIA's primary bell from the bow of the shipwreck. Moyer also intended to recover Italian mosaic friezes from the first-class "Wintergarden" lounge that was located in the forward portion of the shipwreck. In 1992, plaintiff chartered the Research Vessel WAHOO in order to bring the expedition to the DORIA, to place the shipwreck under admiralty arrest, and to commence salvage operations in the bow area.

11. By order dated June 10, 1993, the court issued a warrant to the United States Marshals to arrest the vessel *in rem.*

12. On June 24, 1993, the plaintiff placed a copy of the court's June 10th admiralty arrest in a sealed plastic canister and attached it by cable to the ANDREA DORIA in the immediate vicinity of his salvage oper-

ations. In addition, the plaintiff's attorney sent a letter and copy of the arrest papers to each of the charter vessel captains who had scheduled expeditions to the ANDREA DORIA during the summer of 1993.

13. The plaintiff informed these interested parties that he had placed the defendant shipwreck under admiralty arrest to protect the integrity of his ongoing salvage operations. The plaintiff further informed them that he was not prohibiting other vessels and recreational divers from access to the ANDREA DORIA, and that he would not inhibit their right to recover and possess hand-salvaged artifacts from the area outside the vicinity of Moyer's own recovery effort. On July 30, 1993, the plaintiff gave additional notice to these and any other potential claimants through publication of Notice of Arrest and Hearing in *The Philadelphia Inquirer,* a newspaper of general circulation in the district.

14. From July 4–10, 1993, a team of 18 expert scuba divers and two captains from the R.V. WAHOO conducted salvage operations on the bow and forward sections of the ANDREA DORIA. During this expedition, the divers entered the shipwreck, ascended up a once-horizontal corridor, and removed a door blocking access to the ship's paint locker, an interior room deep inside the shipwreck. Moyer believed the ANDREA DORIA's primary bell could be found inside the locker.

15. Using an airlift, or underwater section dredge, the divers removed much of the debris from the ship's paint locker but did not locate the ship's bell. In late July, 1993, a subsequent expedition to find and salvage the ANDREA DORIA bell was canceled due to adverse sea and weather conditions. Moyer plans to continue his search for the bell in the summer of 1994.

16. In approximately 30 coordinated dives to the ANDREA DORIA, Moyer's team recovered two large Italian mosaic friezes from inside the ship's Wintergarden lounge. The team first dug the mosaics free from the silt and debris burying them and then disengaged them from mountings which still attached them to the shipwreck. Next, the

team wrapped heavy nylon lifting straps around the 700 pound, 5' by 6' tile-and-ceramic panels, attached inflatable lift bags to the straps, and then pumped air into the lift bags to buoy the panels. The panels were carefully worked out of a small opening on the port, or uppermost side of the wreck, and then sent to the surface. At the surface, the friezes were lifted onto the R.V. WAHOO. The plaintiff has documented the entire process, from the initial discovery of the panels to their recovery and ongoing preservation, through video, still photography, and written account.

17. Since their recovery, the mosaic panels have been in the actual physical possession of the plaintiff, John F. Moyer.

18. No party has come forth to assert any adverse ownership claim or interest in the mosaic friezes recovered by John F. Moyer.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

■ The defendant shipwreck, the ANDREA DORIA, lies in international waters outside the territorial jurisdiction of this court. Nevertheless, "[c]laims arising out of salvage operations at sea beyond the territorial limits of the United States are within the admiralty jurisdiction of the federal courts." *MDM Salvage, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel,* 631 F.Supp. 308, 311 (S.D.Fla.1986) (citing *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560 (5th Cir.1981) (*Treasure Salvors III*)).

The court has jurisdiction *in personam* over the plaintiff and over any claimant who may intervene in this action in the future. The court has jurisdiction *in rem* over the mosaic friezes recovered by plaintiff and brought within this district.

■ The court has *quasi in rem* jurisdiction over the portion of the shipwreck which lies outside of the territorial waters of the State of New Jersey. Traditionally, for a court to assert jurisdiction over a vessel, the presence of the vessel or other res within the court's territorial confines is required. An exception to this res requirement has emerged where the vessel is a shipwreck upon which salvage operations are being conducted. This exception allows the court to assert *quasi in rem* jurisdiction over the shipwreck. Implicit in this exception is the recognition that it is often a practical impossibility to bring the vessel and all its contents into the territorial confines of the court. *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 335 (5th Cir.1978) (*Treasure Salvors I*). In addition, this exception complements the law of maritime salvage, which vests certain rights in a salvor because of his interest in completing his salvage operation without interference from others. *Treasure Salvors III,* 640 F.2d at 567. Finally, this exception looks to the future, with the "reasonable likelihood" that the salvage operation will result in other portions of the shipwreck being brought into the territorial and thus *in rem* jurisdiction of the court. *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel, "Nuestra Senora De Atocha",* 546 F.Supp. 919, 929 (S.D.Fla. 1981) (remand).

■ The plaintiff has conducted viable salvage operations on the ANDREA DORIA which permit the court's *quasi in rem* jurisdiction to extend to the shipwreck. Since the arrest of the defendant shipwreck on June 10th of this year, the plaintiff chartered two expeditions to the DORIA. The tangible result of those expeditions has been the recovery of the aforementioned friezes. It is reasonably likely that plaintiff's salvage operations will yield other portions of the shipwreck that will be brought into the territorial jurisdiction of this court. *See also Columbus–America Discovery Group, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, S.S. Central America,* 1989 A.M.C. 1955 (E.D.Va.1989) (U.S.District Court obtained jurisdiction, through arrest of a lump of coal, over shipwreck which lies in international waters, 180 miles offshore of Virginia.)

### B. Abandonment

■ Two legal theories of law may be applied to shipwrecked vessels: the law of finds and the law of salvage. Applying the

law of finds is proper only when there has been a finding that the sunken property has been abandoned by its previous owners. *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.*, 974 F.2d 450. 464 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993). This finding must be supported by clear and convincing evidence. *Id.*

Abandonment may be inferred from circumstantial evidence. Factors such as lapse of time and nonuse by the owner may give rise to an inference of an intent to abandon. *Wiggins v. 1100 Tons, More or Less, of Italian Marble*, 186 F.Supp. 452, 456 (E.D.Va.1960). Other factors include the place of the shipwreck as well as the actions and conduct of the parties having ownership rights in the vessel. *Columbus–America Discovery Group v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 742 F.Supp. 1327, 1335 (E.D.Va.1990) (*rev'd on other grounds, Columbus–America Discovery Group v. Atlantic Mut. Ins. Co., supra.*).

Two cases have addressed the specific question of when it is proper to infer an intent to abandon a shipwrecked vessel by an insurer who has acquired ownership interests in the vessel through subrogation. Those cases are *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.* and *Zych v. Unidentified, Wrecked and Abandoned Vessel, Believed to be the SB "Lady Elgin"*, 755 F.Supp. 213 (N.D.Ill.1990). In *Columbus–America*, the Court of Appeals found that the lower court had erred when it concluded that Atlantic Mutual had abandoned an 1852 sidewheel steamer which sank in waters some 160 miles off the coast of Georgia. To support this finding, the Court of Appeals emphasized that the insurer had engaged in negotiations with salvors to locate and recover gold contained in the vessel for nearly two decades before its actual discovery. During these negotiations, the insurer had never affirmatively renounced its ownership interest in the vessel. Given this conduct, a conclusion of abandonment was improper.

Similar to *Columbus–America*, the District Court for Illinois found in *Zych* that intent to abandon could not be inferred from the conduct of Aetna, the insurer of the Lady Elgin. The Lady Elgin had sunk in Lake Michigan in 1860 and its exact location was not discovered until 1989. The court found that Aetna had maintained records of the loss and had specifically instructed its agents not to abandon the Lady Elgin. In addition, the court addressed the issue of whether abandonment could be inferred from the insurer's failure to take any affirmative action to recover the vessel for the 130 years following the sinking. The court decided that since the technology to locate and salvage the vessel did not exist until the 1980s, Aetna was not "required to engage in efforts to recover the wreck to avoid abandoning its interest when such efforts would have had minimal chances for success." *Zych*, 755 F.Supp. at 216.

Unlike Aetna in *Zych*, the Societa's failure to engage in salvage efforts of the ANDREA DORIA is not excused by a lack of available technology to locate and salvage the vessel. The vessel's final resting place was documented in photographs within 24 hours of its sinking. The technology with which to salvage the vessel has been in existence since at least 1964, when the TOP CAT expedition recovered the statue of Admiral Andrea Doria. Moreover, amateur divers have conducted their own salvage operations on the ANDREA DORIA since 1966.

Other than the initial solicitation of salvage offers, the Societa, unlike the insurer in *Columbus–America*, has not engaged in continuing negotiations with salvors which would support a finding that it did not intend to abandon the vessel. Although the Societa has never affirmatively renounced its ownership interest, the Societa's inaction in the face of numerous independent salvage operations, both amateur and professional, implies a renunciation. The Societa has never contested the ownership of property recovered from the ANDREA DORIA. If the property recovered were all without value, this inaction may have been justified; however, the items recovered have included a bronze statue and the purser's safe. The opening of the purser's safe on international television is an indication of the open and notorious atmosphere in which the salvage operations have

been conducted. Given the available facts, only one inference with respect to the ANDREA DORIA may be drawn. The Societa has abandoned the vessel and its contents.

### C. *Title*

▮▮▮▮ Title to abandoned property is acquired by the finder who demonstrates "occupancy," which is defined as "taking possession of the property and exercising dominion or control over it." *Treasure Salvors III*, 640 F.2d at 572. Occupancy has also been defined as occurring where the finder has both an intent to acquire specific property and has realized that intent through control of the property. *Hener v. United States*, 525 F.Supp. 350, 356 (S.D.N.Y.1981). The discovery of abandoned property, without more, is an insufficient basis on which to award title to the property. *Treasure Salvors III*, 640 F.2d at 572.

▮▮▮ There can be little argument that title to the mosaic friezes should be awarded to the plaintiff. This case is sufficiently similar to *Martha's Vineyard Scuba Headquarters, Inc. v. The Unidentified, Wrecked and Abandoned Steam Vessel*, 833 F.2d 1059 (1st Cir.1987), where a salvor's title to articles already recovered from a sunken ocean liner was affirmed by the Court of Appeals. The court held that "the first finder lawfully to appropriate the abandoned artifacts, take dominion over them, and return them to land with the aim of acquiring ownership rights—had the prime claim to the articles." *Martha's Vineyard*, 833 F.2d at 1065. Similar to the salvor in *Martha's Vineyard*, the plaintiff placed the ANDREA DORIA under admiralty arrest and conducted lawful salvage operations upon the vessel. The plaintiff's dominion over the friezes is essentially a foregone conclusion, given their transport to and appearance in this court. Therefore, this court grants title to the friezes to the plaintiff. This title to the friezes is against all the world, with the exception of the true owner that could rebut the underlying assumption of abandonment of the friezes. *Hener*, 525 F.Supp. at 356.

### D. *The Preliminary Injunction*

▮▮▮ Equitable relief, where appropriate, may be granted by a United States District Court in an admiralty action. *Indian River Recovery Co. v. The China*, 645 F.Supp. 141, 145 (D.Del.1986). This relief may be granted despite the shipwreck not being present within the territorial jurisdiction of the court. This is because a preliminary injunction enjoins competing salvors, to which the court may extend its *in personam* jurisdiction. *Treasure Salvors III*, 640 F.2d at 567.

In this case, the plaintiff requests a preliminary injunction in order to find and salvage the bell of the ANDREA DORIA as well as additional mosaics from the ship's Wintergarden lounge. The requested injunction would remain in effect through the end of the summer of 1994.

Two factors distinguish this request from the usual request for a preliminary injunction. An initial order has already issued from this court arresting the shipwreck and permitting the plaintiff's salvage operation. In addition, neither the Societa nor any competing salvor has come forward to claim superior salvage rights in the vessel or its contents. At the present time, the competing salvors to which this court's jurisdiction extends are limited to one—the plaintiff.

▮▮▮ For a preliminary injunction to issue where the court already has issued an initial arrest order, and the preliminary injunction is designed to protect salvage operations, the "salvor's efforts must be (1) undertaken with due diligence, (2) ongoing, and (3) clothed with some prospect of success." *Martha's Vineyard*, 833 F.2d at 1061. This standard is markedly different from that applied when deciding whether to award title to the finder of lost or abandoned property. Physical possession of a thing (in this case, the wreck site) is not required before an injunction may issue to preserve the salvor's rights. *Treasure Salvors*, 640 F.2d at 572. The possession also need not be continuous, but only as such the "nature and situation" of the salvage operations permit. *Hener*, 525 F.Supp. at 354 (quoting *Eads v. Brazelton*, 22 Ark. 499, 511 (1861)). At the same time, the possession must be notorious and give warning to actual or potential rival salvors of the ongoing salvage operations. *Cobb Coin*

*Co., Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 525 F.Supp. 186, 204 (1981). Possession is not defeated, however, when the salvor leaves the wreck for a justifiable reason and with an intention of returning. *Rickard v. Pringle,* 293 F.Supp. 981, 985 (S.D.N.Y.1968).

In *MDM Salvage,* a U.S. District Court in Florida was confronted with two different salvage companies making separate requests for exclusive rights to salvage an ancient shipwreck. The court denied both requests for injunctive relief, finding that neither salvor had engaged in the sustained salvage operations which would justify a grant of exclusive salvage rights. To support this finding, the court highlighted that the parties' lack of independent research, the insufficient capital investment in their respective operations, and the fact that neither party could demonstrate that the articles recovered were from one particular wreck. In addition, neither party had attempted to preserve the archaeological value of the wreck. Thus, the court held that "no near-term ability to salvage the wreck or wrecks in question has been demonstrated." *MDM Salvage,* 631 F.Supp. at 312.

▮ Here, on the other hand, the plaintiff has demonstrated a near-term ability to salvage the ANDREA DORIA. The best indication of this ability is found in the plaintiff's past operations. The plaintiff conducted substantial historical research of the ANDREA DORIA before beginning its salvage, including corresponding with the vessel's surviving crew members. His efforts are thus distinguishable from the salvors in *MDM Salvage,* who relied solely on secondhand sources for their information. The plaintiff has also invested substantial amounts of capital and resources into the salvage of the vessel, as evidenced by his chartering the R.V. WAHOO, hiring a team of 18 scuba divers, and supervising approximately 30 coordinated dives on the shipwreck.

▮ This court also recognizes the plaintiff's documentation of his salvage efforts through still and video photography and written account, all of which go to the archaeological preservation aspect highlighted in *MDM Salvage.* This element has less importance in the instant case, however, because of the relatively young age of the shipwreck and the documentation already existing on the ship and its final resting place. Archaeological preservation is most important in cases involving treasure ships where the preservation may constitute a "window in time ... to an earlier era." *MDM Salvage,* 631 F.Supp. at 310. Nevertheless, where the circumstances merit, salvors have not been held to the same standard as marine archaeologists. *Platoro Limited, Inc. v. Unidentified Remains of a Vessel* 518 F.Supp. 816, 822 (W.D.Tex.1981), *aff'd* 695 F.2d 893 (5th Cir.1983), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). The ANDREA DORIA is of decidedly modern vintage. There exist extensive photographs, deck plans, models and other documentation of the ocean liner and her appointments. The shipwreck, moreover, is essentially intact; no extensive debris field of wreckage has distributed the vessel's contents across the seafloor so as to require exacting plotting and mapping of the objects recovered.

From the above examination of the plaintiff's past operations it is clear that his efforts have undertaken with due diligence. That these efforts have been "clothed with some prospect of success" can scarcely be denied: the two recovered friezes are a tangible and substantial measure of his success.

▮ Our inquiry is thus narrowed to whether the plaintiff's operations are "ongoing." This inquiry has a slightly different focus than the due diligence inquiry: the evaluation looks not only to the salvor's past efforts, but also to his present intentions. *See Treasure Salvors III,* 640 F.2d at 567. ("Among the most important of these rights are [sic] the right to exclude others from participating in the salvage operations, so long as the original salvor appears ready, willing and able to complete the salvage project.")

▮ From an objective evaluation of the available facts, it is clear that the plaintiff presently intends to continue his salvage efforts. The plaintiff undertook the salvage of the ANDREA DORIA with two goals in

mind: to recover the primary bell from the bow of the shipwreck, and to retrieve the Italian mosaic friezes from the ship's Wintergarden lounge. To date, he has not met the first goal and has been only partially successful with respect to the second. This is through no fault or lack of ability on his part: adverse sea and weather conditions prevented him from making a second salvage attempt in late July, 1993. The end of the viable salvage season in mid-August prevented him from making any other attempts in 1993. The plaintiff has stated his intention to continue his search for the ANDREA DORIA bell in 1994. Given these facts, the plaintiff's efforts are sufficiently "ongoing" to support the issuance of a preliminary injunction protecting those efforts.

Accordingly, a preliminary injunction on plaintiff's behalf is hereby granted. By this preliminary injunction, other salvors are enjoined from interfering with the plaintiff's efforts to recover the ANDREA DORIA bell, the Italian friezes, and any other valuable property. The plaintiff's right to exclude other salvors extends only to that area in which he chooses to place his equipment and personnel. *See Hener,* 525 F.Supp. at 355.

By granting this preliminary injunction, the court does not purport to adjudicate preexisting rights of public access and salvage of the ANDREA DORIA. In this respect, the court is aware of the factually similar Third Circuit case, *Indian River Recovery Co. v. The China,* 645 F.Supp. 141 (D.Del.1986). In *Indian River,* a commercial salvor sought exclusive rights to salvage a nineteenth-century shipwreck. Similar to the ANDREA DORIA, the wreck was a popular site for recreational diving, where "[t]housands of divers ... [had] brought to the surface over ten thousand pieces of its ironstone china cargo." *Indian River,* 645 F.Supp. at 143. The District Court allowed a consortium of scuba divers, charter boat operators, and fishing boat captains to intervene in the action, which claimed a preexisting right to dive the wreck and salvage its ironstone china. The court agreed with the consortium and issued a permanent injunction against the salvor.

Despite the underlying factual similarities between *Indian River* and the instant case, there are two significant differences between the cases. First, and most obviously, no one has come forward and asserted any preexisting rights to salvage the ANDREA DORIA. Second, it was believed in *Indian River* that the commercial salvage of the wreck would have totally destroyed it as a fishing and diving destination. From the facts before us, it does not appear that the plaintiff's actions will destroy the ANDREA DORIA's worth as a recreational diving destination. The plaintiff seeks to salvage individual artifacts from within the bowels of the ship. He is not engaging in the type of salvage which requires the wholesale destruction of entire sections of the ship. Moreover, his independent research and the archeological documentation of his salvage efforts indicate a respect for the ANDREA DORIA as something other than just a commercial salvage project.

IT IS HEREBY ORDERED on this 18th day of November, 1993 that: Plaintiff's request for a preliminary injunction is GRANTED. In accordance with this opinion, other salvors are enjoined from interfering with the plaintiff's efforts to recover the ANDREA DORIA bell, the Italian mosaic friezes from the ship's Wintergarden lounge, and any other valuable artifacts.

IT IS FURTHER ORDERED this preliminary injunction shall remain in effect through the 1994 salvage season.

IT IS FURTHER ORDERED that plaintiff shall report to the court at the commencement and conclusion of any 1994 ANDREA DORIA salvage operations.