MAREX INTERNATIONAL,
INC., Plaintiff,

v.

The UNIDENTIFIED, WRECKED AND ABANDONED VESSEL, her hull, cargo, tackle and appurtenances etc. in rem, which lies within one (1) nautical mile of a point with coordinates 33 degrees 24′00″ North Latitude and 78 degrees 40′00″ West Longitude, Defendant.

No. CV 496–194.

United States District Court,
S.D. Georgia,
Savannah Division.

Jan. 13, 1997.

George M. Earle, Savannah, GA, Peter A. Hess, Wilmington, DE, for Plaintiff.

### MEMORANDUM

NANGLE, District Judge.

Plaintiff, MAREX ("Marine Archaeology Exploration") International, Inc., filed a com-plaint in admiralty with this Court on August 12, 1996. On the same day, this Court grant-ed plaintiff's motion for warrant of arrest of the defendant vessel, now known to be the S.S. NORTH CAROLINA. The warrant was subsequently executed. Plaintiff's mo-tion for appointment for substitute custodian of the shipwreck and any artifacts recovered was also granted. On November 4, 1996, plaintiff filed a notice of publication of the arrest of the above-referenced vessel. At plaintiff's request a hearing was held on Jan-uary 6, 1997 to adjudicate title to artifacts recovered from the shipwreck. This Court issued an order on January 8, 1997 conclud-ing that the S.S. NORTH CAROLINA was an abandoned vessel which plaintiff had tak-en exclusive control of with due regard for its archaeological and historical significance. The Court further concluded that the arti-facts recovered were the sole and exclusive property of plaintiff and that plaintiff would be allowed to continue its salvage operations into the 1997 salvage season [1] without inter-ference by third parties. The following find-ings of fact and conclusions of law are based on the January 6, 1997 hearing and are en-tered in support of this Court's Order dated January 8, 1997.

### FINDINGS OF FACT

1. MAREX is a corporation which has been engaged in the research and archaeo-logical excavation of shipwrecks since 1982. MAREX has had a number of successful shipwreck archaeological recovery opera-tions, including: the Nuestra Senora De Las Maravillas off the Little Bahama Bank, from which MAREX recovered many significant artifacts; the wreck of El Cazador, a Spanish frigate which sank in the 1780's approximate-ly 50 miles south of the Mississippi Delta; and several historic shipwrecks off the coast of Florida.

2. In 1994, MAREX set up a base of operations in Brunswick, Georgia and began archival research and offshore remote elec-tronic sensing for a number of target vessels

---

1. A salvage season is that portion of the year that weather conditions permit divers to attempt sal-vage operations. Typically this is from March until August in the southeastern United States.

lost off the coast of the southeastern United States.

3. MAREX owns and operates a research vessel, the R/V BEACON, which is a 110' ocean-going ship equipped with state of the art technology for search-and-recovery work. MAREX also employs a number of specialists in its search and recovery operations, including experts in remote electronic sensing, archival researchers and nautical archaeologists.

4. MAREX has commissioned extensive archival research into the S.S. NORTH CAROLINA, one of the targets of its search operations. MAREX obtained historical information about the shipwrecked vessel from a number of archives along the east coast of the United States, including the Vanderbilt Museum and its repository of records in New York City, the Library of Congress in Washington, D.C., as well as regional libraries in North and South Carolina. Robert Stenuit, a prominent shipwreck researcher and salvor from Brussels, Belgium, conducted much of the archival research.

5. MAREX's research indicated that the S.S. NORTH CAROLINA sank early in the morning of July 26, 1840 following a collision with the S.S. GOVERNOR DUDLEY. Although the S.S. NORTH CAROLINA sank without loss of life, almost all of the passengers' possessions and the cargo onboard were lost in its sinking.

6. Both the S.S. NORTH CAROLINA and the S.S. GOVERNOR DUDLEY were owned by the Wilmington and Raleigh Railroad Company; the vessels were used to transport passengers between railheads in Charleston, South Carolina and Wilmington, North Carolina. The railroad was solely owned by Commodore Cornelius Vanderbilt. Vanderbilt had not insured either vessel and made no effort to locate or salvage the NORTH CAROLINA after its sinking; his heirs also never searched for or asserted any claim of title to the vessel or its contents. The Vanderbilt Museum has not contested plaintiff's admiralty arrest or filed any competing claim of title to the shipwreck or its artifacts.

7. In August of 1996, MAREX was engaged in remote electronic sensing work outside the territorial seas of the United States. Somewhere off the coast of South Carolina the BEACON came across a shipwreck site known to local divers as the "Copper Pot Wreck." The site is located approximately eighteen (18) nautical miles east of Myrtle Beach, South Carolina.

8. In the several years preceding its discovery by MAREX, the shipwreck had rarely been dived. There had been no comprehensive archaeological or historical research to identify the "Copper Pot Wreck," no effort by any diver to conduct a systematic site survey, no attempt to uncover the mostly buried shipwreck and salvage its artifacts, and no ongoing salvage operations at the time of the admiralty arrest.

9. MAREX confirmed that the "Copper Pot Wreck" is in fact the S.S. NORTH CAROLINA by the presence of a rare early version of the steam engine and boiler which was made entirely of copper. At the time MAREX discovered the vessel, little more than the boilers and engines were visible above the sand and mud, which comprised the ocean bottom at the wreck site. After assessing the physical parameters of the S.S. NORTH CAROLINA wreck site, MAREX's vessel, the BEACON, deployed its "mailboxes," devices designed to deflect the ship's prop wash directed towards the bottom of the sea floor, and excavated a small crater in the sand uncovering objects that had been covered.

10. By using these mailboxes, the BEACON was able to uncover large sections of the ship's hull and divers were able to recover small artifacts after they had been mapped on a site map.

11. The artifacts were catalogued and field-cleaned on the BEACON by artifact preservation expert Rene Charette. The artifacts were then sent to MAREX's artifact conservation laboratory in Brunswick, Georgia, which is run by Charette. The laboratory uses various preservation techniques which prevent the artifacts from quickly disintegrating when exposed to the air.

12. The artifacts recovered by MAREX during its 1996 salvage operations include pieces of the vessel's engines and boilers, ornate fittings from the passengers' cabins, china and dishware, brass spikes and nails, a collection of 18 U.S. gold Quarter Eagles, half dollar denomination coins minted from the years 1834 until 1840, and two ornate gold pocket watches which have been preserved, but not yet fully restored.

13. The historical research, the BEACON's daily logs, the site maps of the wreck site and the studies of the artifacts recovered have been synthesized to produce a preliminary archaeological report on the S.S. NORTH CAROLINA. The report is a "work in progress" which upon completion of field operations will be archived in various local university collections as well as the Vanderbilt Museum in New York City.

14. MAREX also has hopes of putting a collection of the S.S. NORTH CAROLINA artifacts on public display in the local region. Other artifacts may be sold at auction in order to help underwrite the costly archaeological recovery operation.

15. MAREX's salvage operations were interrupted by hurricanes and inclement weather during the summer and fall of 1996, but it intends to return to the site of the S.S. NORTH CAROLINA when weather permits, possibly as early as March 1997.

### CONCLUSIONS OF LAW

A. *Jurisdiction*

■ Jurisdiction is proper in this Court. 28 U.S.C. § 1333; Fed.R.Civ.P. 9(h). This Court has jurisdiction *in rem* over the artifacts recovered by the plaintiff and brought within this district. *Moyer v. The Wrecked & Abandoned Vessel known as The Andrea Doria*, 836 F.Supp. 1099, 1104 (D.N.J.1993). Claims, such as the one in the present case, arising out of salvage operations in international waters beyond the territorial limits of the United States are within the admiralty jurisdiction of the federal courts by virtue of an exception to the traditional res requirement, which allows a court to assert *quasi in rem* jurisdiction over a shipwreck upon which salvage operations are being performed.

*Treasure Salvors, Inc. v. The Unidentified, Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 566 (5th Cir.1981); *Moyer*, 836 F.Supp. at 1104; *MDM Salvage, Inc. v. The Unidentified, Wrecked & Abandoned Sailing Vessel*, 631 F.Supp. 308, 311 (S.D.Fla.1982).

■ The *quasi in rem* exception allowing jurisdiction over a shipwreck recognizes "that it is often a practical impossibility to bring the vessel and all its contents into the territorial confines of the court." *Moyer*, 836 F.Supp. at 1104. Plaintiff has demonstrated the requisite degree of control and dominion over the defendant vessel to allow this Court to exercise its *quasi in rem* jurisdiction over it, as plaintiff's presence upon the vessel has been as close to continuous as is reasonable given the frequent hurricanes and inclement weather during the past salvage season. *See Columbus–America Discovery Group, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 742 F.Supp. 1327, 1333–34 (E.D.Va. 1990), *rev'd on other grounds*, 974 F.2d 450 (4th Cir.1992) (upholding *in rem* jurisdiction over wreck 160 miles offshore based on tender of items recovered to court and salvor's recovery operations).

B. *The Law of Finds or The Law of Salvage*

■ Admiralty courts have used two theories of law when adjudicating title and determining salvage rights to shipwrecked vessels. The law of finds, which is epitomized in the rule of "finders keepers, losers weepers," applies when a shipwreck has been abandoned by its owner, either through formal renunciation of title or through inaction over time and the failure to assert any claim to the vessel in court. *Columbus–America Discovery v. Atlantic Mut. Ins.*, 974 F.2d 450, 461 (4th Cir.1992); *Moyer*, 836 F.Supp. at 1105; The law of salvage applies to shipwrecks that have not been expressly abandoned by their owners. *Columbus–America Discovery*, 974 F.2d at 459. Under the law of finds, the finder gains title, but under the law of salvage the finder is entitled only to a salvage award. *Chance v. Certain Artifacts Found & Salvaged from The NASHVILLE*, 606 F.Supp. 801, 804 (S.D.Ga.1984). In the present case, neither the owner nor his heirs

have ever made any attempt to recover the vessel or the contents thereof since its sinking in 1840. Nor have the owner or his heirs asserted any claim in the present action. The Court concludes that the S.S. NORTH CAROLINA has been abandoned by its owner and therefore the law of finds applies, making plaintiff's suit for title appropriate.

## C. The Salvor's Archaeological Duty of Care

Admiralty courts have placed an additional requirement on those who seek to recover property from shipwrecks of historic or archaeological significance under both the law of finds and the law of salvage. The S.S. NORTH CAROLINA is an historic shipwreck because it meets at least two of the criteria set forth in the regulations for the National Register of Historic Places. 36 C.F.R. pt. 60.4. The ship's copper boilers and steam engines represent a rare example of an emerging technology. *See* 36 C.F.R. pt. 60.4(c). In addition, when the ship went down many prominent people of the day were onboard, including eight members of Congress. *See* 36 C.F.R. pt. 60.4(b).

 Because the vessel is an historic shipwreck, the archaeological duty of care requires that the finder or salvor document to the court's satisfaction the shipwreck's archaeological "provenance data."[2] Documentation of "provenance data" is accomplished by mapping or recording the location, depth and proximity of each artifact recovered in relation to the other artifacts. *Cobb Coin Co. v. The Unidentified, Wrecked & Abandoned Sailing Vessel,* 549 F.Supp. 540, 558–59 (S.D.Fla.1982). Plaintiff has met its duty to document the archaeological and historical significance of the S.S. NORTH CAROLINA. Plaintiff compiled an historical record of the wreck from several libraries and archives along the East Coast, plaintiff trained its divers in the archaeological methods of mapping the artifacts and carefully used those methods when excavating the shipwreck, plaintiff subjected each recovered artifact to conservation treatment at its Brunswick laboratory, and plaintiff retained the appropriate experts to aid it in its evaluation and conservation of the various artifacts recovered.

## D. Injunction

 District Courts may grant equitable relief in an admiralty action. *Moyer,* 836 F.Supp. at 1106, (citing *Indian River Recovery Co. v. The China,* 645 F.Supp. 141, 145 (D.Del.1986)). A preliminary injunction enjoins competing salvors who are subject to the court's *in personam* jurisdiction. *Id.,* (citing *Treasure Salvors, Inc. v. The Unidentified Wrecked & Abandoned Sailing Vessel,* 640 F.2d 560, 567 (5th Cir.1981)). There are three requirements for the issuance of a preliminary injunction in cases, like the present one, where an initial arrest order has been issued and where the protection is sought for the salvor's ongoing efforts. The salvor must show that its efforts are (1) undertaken with due diligence; (2) ongoing; and (3) clothed with some prospect of success. *Id.,* (citing *Martha's Vineyard Scuba Headquarters, Inc. v. The Unidentified, Wrecked & Abandoned Steam Vessel,* 833 F.2d 1059, 1061 (1st Cir.1987)).

 Plaintiff has met all three requirements. The archaeological and historical research and the preservation measures taken by plaintiff demonstrate that it has acted with due diligence in conducting its salvage operations. Plaintiff's salvage operations are ongoing, as it has plans to return to the site as soon as the weather permits. Plaintiff has already recovered many artifacts from the shipwreck site, showing that its venture is "clothed with some prospect of success." It should also be noted that there are no competing salvors and that there has been no showing of a preexisting right of public access, because the site was only sporadically visited by divers and fishermen. Accordingly, a preliminary injunction on behalf of plaintiff is granted and shall remain in effect through the 1997 salvage season.

---

**2.** "Provenance data" is a term of art used in the field of underwater archaeology which is defined as "the exact location, depth and proximity of each item found with respect to the other items." *Cobb Coin Co.,* 549 F.Supp. at 558.

### E. *Conclusion*

For the reasons set forth above, the Court concludes that the S.S. NORTH CAROLINA is an abandoned vessel over which plaintiff has exclusive dominion and control. Plaintiff is entitled to title of any and all artifacts previously recovered from the shipwreck. Plaintiff shall have the exclusive right to continue its ongoing salvage operations through the 1997 salvage season and any and all third parties are preliminarily enjoined from interfering. The S.S. NORTH CAROLINA will continue to be under admiralty arrest and plaintiff shall remain the Substitute Custodian of any artifacts recovered. Plaintiff shall submit a written report to this Court summarizing its salvage operations at the end of each salvage season, but no later than December 1st of each year, until further order of this Court.