**FAIRPORT INTERNATIONAL EXPLORATION, INC.,**
Plaintiff,

v.

**The SHIPWRECKED VESSEL, known as The Captain Lawrence, which sank in 1933, her engines, tackle, appurtenances, and cargo located within two nautical miles of a point at coordinates 45 degrees 32′ North Latitude and 86 degrees 40′ West Longitude in rem, Defendant,**

and

**The State of Michigan, Intervenor.**

No. 2:94–CV–164.

United States District Court,
W.D. Michigan,
Northern Division.

June 14, 1995.

---

Roger W. Kangas, Casselman & Kangas, PC, Marquette, MI, Peter E. Hess, Peter E. Hess Law Offices, Wilmington, DE, for plaintiff.

Fairport International Exploration, Inc., Chantilly, VA, pro se.

Stephen F. Schuesler, Frank J. Kelley, Attorney General, Natural Resources Division, Lansing, MI, for intervenor.

## *OPINION*

ROBERT HOLMES BELL, District Judge.

Plaintiff Fairport International Exploration, Inc., filed this admiralty in rem action in order to establish its right to salvage a shipwrecked vessel, the *Captain Lawrence,* which sank in the waters of Lake Michigan in 1933.

The State of Michigan has intervened in order to present its claim of title to the vessel under the Abandoned Shipwreck Act of 1987 ("ASA"), 43 U.S.C. § 2101–06; the Submerged Lands Act, 43 U.S.C. § 1311 *et seq.;* the Aboriginal Records and Antiquities Act, M.C.L. § 299.51 *et seq.;* M.S.A. § 13.21 *et seq.;* the Great Lakes Submerged Lands Act, M.C.L. § 322.701; M.S.A. § 13.700(1); and the exception to the common law of finds

for artifacts found embedded in the land of another.

This matter is currently before the Court on the State's motion to dismiss for lack of jurisdiction. The State contends that the Court lacks subject matter jurisdiction to proceed with this matter because the State has a "colorable claim" of ownership to the *Captain Lawrence* by virtue of the Abandoned Shipwreck Act of 1987 ("ASA"), 43 U.S.C. § 2101 *et seq.*, and that accordingly Fairport's *in rem* action against the vessel is really an action against the State which is prohibited by the Eleventh Amendment to the United States Constitution.

■ Under the ASA, the United States asserts title to any abandoned shipwreck that is embedded in submerged lands of a State, embedded in coraline formations on submerged lands of a State, or on submerged lands of a State and included in or eligible for inclusion in the National Register of Historic Places. 43 U.S.C. § 2105(a). The Act further transfers title of any such abandoned shipwreck to the State on whose submerged lands the shipwreck is located. 43 U.S.C. § 2105(c). The Eleventh Amendment prohibits a federal district court from declaring that a claimant has rights superior to those of the State which asserts a colorable claim of interest in a shipwreck. *See e.g., Zych v. Wrecked Vessel Believed to be SB "Lady Elgin"*, 960 F.2d 665, 670 (7th Cir.), *cert. denied,* 506 U.S. 985, 113 S.Ct. 491, 121 L.Ed.2d 430 (1992); *Sindia Expedition, Inc. v. Wrecked and Abandoned Vessel, Known as "The Sindia"*, 895 F.2d 116, 122 (3rd Cir.1990); *Fitzgerald v. Unidentified Wrecked and Abandoned Vessel,* 866 F.2d 16, 17 (1st Cir.1989).

In the order scheduling the hearing the Court required the State to carry the burden of proof by a preponderance of evidence as to abandonment. The State contests its burden of proof on this motion. The State contends that it does not need to prove abandonment in order to be entitled to dismissal, but need only show that it has a "colorable claim" to the *res.* If it shows it has a "colorable claim" to the *res,* then the Eleventh Amendment precludes this Court from adjudicating the State's interest in the property.

The "colorable claim" language stems from the plurality opinion of the Supreme Court in *Florida Dept. of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982). In *Treasure Salvors,* a case involving an abandoned ship in international waters, four justices held that the Eleventh Amendment was no bar to the action against the State because the State had no "colorable interest" in the wreck.

Since *Treasure Salvors* courts have applied, without defining, the "colorable interest" test. *See, e.g., Marx v. Government of Guam,* 866 F.2d 294, 300–301 (9th Cir.1989); *Maritime Underwater Surveys, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel, The "Whidah"*, 717 F.2d 6, 7–8 (1st Cir.1983); and *Subaqueous Exploration & Archaeology, Ltd. v. Unidentified, Wrecked and Abandoned Vessel,* 577 F.Supp. 597, 607 (D.Md.1983), *aff'd,* 765 F.2d 139 (4th Cir. 1985). The State relies on these cases for the proposition that it need merely come forward with a "colorable claim" of interest in the *res* to defeat jurisdiction, and further, that a "colorable claim" is nothing more than a claim advanced by a state based on presumptively valid state and federal statutes.

■ The State's reliance on these cases for its second contention, i.e., that it need merely rely on the ASA to show it has a colorable claim, is misplaced. All of the cases relied on involved undisputedly abandoned shipwrecks. When a shipwreck is abandoned there is no question that the ASA itself gives the state a colorable claim to the property. But where, as here, there is no agreement that the shipwreck is abandoned, the state must do more than invoke the ASA to show a "colorable interest."

In *Deep Sea Research, Inc. v. The Brother Jonathan,* 883 F.Supp. 1343 (N.D.Cal.1995), the State of California filed a motion to dismiss an admiralty in rem action action against the wreck of the *S.S. Brother Jonathan* on the basis of the ASA. The court held that to establish the existence of a "colorable claim" to the shipwreck under the ASA, "the State must establish, by a preponderance of the evidence, that the ASA applies to the vessel at issue." *Id.* at 1349. *See*

*also, ITSI TV Prods. v. Agricultural Ass'ns,* 3 F.3d 1289, 1291–92 (9th Cir.1993).

If the State bears its burden of showing by a preponderance of the evidence that the *Captain Lawrence* has been abandoned and is embedded in the submerged lands of the state, then the State would have a "colorable claim" to the *Captain Lawrence* under the ASA and the Court would be divested of jurisdiction to adjudicate the merits of the State's claim.

The Court's first responsibility, therefore, is to determine whether the ASA applies— i.e., whether the vessel has been abandoned. As noted in *Zych v. The Seabird,* 811 F.Supp. 1300, 1312 n. 9 (N.D.Ill.1992):

> Upon taking jurisdiction over the case, the federal court's first responsibility would be to determine whether or not the wreck has been abandoned because the resolution of that question determines whether or not the federal court has jurisdiction. Presumably, the ASA does not affect the federal court's jurisdiction to resolve questions relating to its jurisdiction.

In order to determine whether this Court has subject matter jurisdiction over this case, an evidentiary hearing was held on April 12 and 13, 1995, on the issue of abandonment. The Court makes the following findings of fact:

### Findings of Fact

The *Alice,* a two-masted schooner yacht, was built in 1898. In 1919 the vessel was rebuilt as a "gas screw" yacht, with a gasoline-powered internal combustion engine. The vessel was sold to the Milwaukee County Council, Boy Scouts of America, in 1924 for use as a training ship for sea scouts and was renamed the *Captain Lawrence.*

The *Captain Lawrence* sank in deep water in 1931. The vessel was towed into the shallow water of the Menominee River in Milwaukee where she lay for some time. In May 1932 the Boy Scouts sold the vessel to Wilfred H. Behrens of Milwaukee, Wisconsin for $150.00.

On August 26, 1933, the *Captain Lawrence* departed Milwaukee, Wisconsin bound for Summer Island for an amateur diving expedition. She was captained by Wilfred Beh-

rens and had a crew of four. The *Captain Lawrence* was shipwrecked on September 19, 1933.

Wilfred Behrens filed a Record of Casualties to Vessels on November 2, 1933, to report the occurrence at 3:00 a.m. Tuesday, September 19, 1933. In that report he described the nature of the casualty as a stranding, caused when "[a] terrific wind came up while in shelter and threw vessel onto the beach." (Exh. F). He further reported that the propeller shaft broke and the vessel was blown on the rocks. (Exh. F). He reported that no assistance was rendered, but that the Coast Guard rang them up in the morning after they found out about the wreck and asked whether they needed assistance. (Exh. F).

In the Record of Casualties Wilfred Behrens estimated the value of the vessel to be $200.00. He reported that it was carrying no cargo, and estimated the loss or damage to the vessel at "$200.00. Total loss." He reported that there was no insurance on either the vessel or the cargo. (Exh. F). The precise location on Poverty Island where the wreck occurred was not stated.

An undated newspaper photograph of the *Captain Lawrence* was captioned "Schooner Pounded to Pieces." The picture was apparently taken before the shipwreck. (Exh. 9).

Wilfred Behrens' daughters, Alice Behrens Bergmans and Gladys Nally, testified that Wilfred Behrens was a salvage diver and ran a tire capping business. Because SCUBA was not available when he was diving, he wore heavy boots and a hard hat connected to an oxygen hose. They recalled that he would go up north on diving expeditions, that he would often talk about sunken treasure, and that he was concerned about getting funds to finance an expedition. He continued to dive through the mid–1940's, but he never had another boat worthy of the lake waters around Poverty Island. Most of his diving was in rivers. Wilfred Behrens died intestate in 1959.

Steven Libert, President of Fairport International Exploration, Inc., has been interested in the legend of a Civil War era gold treasure allegedly lost in northern Lake

Michigan in the vicinity of Poverty Island since 1978. This interest has become his obsession. Many accounts of the legend make reference a vessel named the *St. Lawrence* that recovered the gold in the 1930's, and then sank off the shores of Poverty Island.

Through his research, Libert determined that references to the *St. Lawrence* were in fact references to the *Captain Lawrence*. Having made this connection Libert was able to locate the heirs of the *Captain Lawrence* and to concentrate his search on a more limited area. Libert believes the *Captain Lawrence* is an important key to locating the legendary gold treasure. He believes the *Captain Lawrence* was searching for the legendary gold treasure at the time of the shipwreck, and might have one chest of gold on it. The ship log might also contain information regarding the treasure.

Libert has been diving around Poverty Island since 1983. He has identified a debris scatter in 40–60 feet of water, adjacent to the shore of Poverty Island, which includes planks, a cable, barrels, and several areas of magnetic declination. In 1984 he found an anchor. In 1985 he located a propeller blade wedged in the rocks off the north shore of Poverty Island. The propeller blade was located 150 feet from the gravel beach on the north side of the island. Libert is certain these objects belong to the *Captain Lawrence*.

Wilfred Behrens' family has not been able to provide Libert much information because Wilfred Behrens was secretive about what he was doing up north. Carl Rushie, one of Wilfred Behrens' diving partners, advised Libert that the diving equipment on the *Captain Lawrence* included a compressor, hard hat diving apparel, and a diving bell. A diving bell washed ashore on the north side of Big Summer Island in 1942.

Libert met with State representatives in September 1993 to discuss what permits would be needed to dredge 3 to 12 feet of silt in a football field sized area. In his discussions with the State Representatives, Libert described his activity as a search for the legendary chests of gold. He said little, if anything about salvaging the *Captain Lawrence*.

In 1994, John Halsey, State Archeologist with the Bureau of History, Michigan Department of State, dove in the area identified by Libert as the site of the *Captain Lawrence*. The visibility around the area was only 5 to 10 feet and silt was easily stirred up, reducing visibility to 0 feet. Halsey observed scattered wooden planks, bricks, a tire, cable, crushed barrels, pails, a metal strainer from a gas engine, and a hanging knee. Most of the observable cultural materials were embedded within the bottom sediments.

The anchor removed from the area by Libert in 1985 is consistent with what might have been used on the *Captain Lawrence*, but it is not distinctive. Similar anchors were in common usage for 100 years, and it is not unusual to find an anchor even where there has been no shipwreck.

The propeller blade is consistent with a ship from the 1930's, but it cannot be identified as belonging to the *Captain Lawrence*. Moreover, the Record of Casualties reports a broken propeller shaft rather than a broken propeller blade.

The artifacts as a whole are generally consistent with a vessel the size and age of the *Captain Lawrence*, but there is nothing unique to the *Captain Lawrence* that could be used to positively identify the remains as those of the *Captain Lawrence*.

The State does not consider any of the artifacts to be significant for purposes of the National Register of Historic Places. The criteria for listing on the National Register of Historic Places is that the object be unique, a good specimen, or associated with an event of historic significance. Even if the artifacts are from the *Captain Lawrence*, the *Captain Lawrence* was a typical yacht from the turn of the century, it is not a good specimen, and the State does not believe it is associated with an event of historic significance.

Kenneth R. Pott, Curator of the Michigan Maritime Museum testified that maritime traffic in the Poverty Island area was heavy in the mid to late 1800's and early 1900's.

The waters around Poverty Island area were not a safe area for navigation and there were historical accounts of two shipwrecks in the Poverty Island area in the late 1800's and may have been the site of other unrecorded wrecks. There are also historical records of many wrecks off of nearby Summer Island.

Because the debris is not distinctive, none of the evidence can be positively identified as coming from the *Captain Lawrence.* Moreover, because other boats were recorded to have gone down in the area, it cannot be said with any degree of certainty that the debris came from only one vessel.

In 1994, all the surviving heirs of Wilfred Behrens assigned their interests in the *Captain Lawrence* to Gladys Nally, who in turn executed a Salvage Bill of Sale with Fairport, granting Fairport the exclusive right to salvage the remains of the *Captain Lawrence.*

### Analysis

Based upon the evidence presented, the Court has very serious reservations as to whether Plaintiff has in fact found any evidence of the *Captain Lawrence.* The evidence is too sparse and generic to be able to say with any certainty that it comes from one vessel, much less to say that it comes from the specific vessel, the *Captain Lawrence.*

Assuming the evidence is sufficient to identify the *res,* the Court must consider application of the ASA. The State does not contend that the *Captain Lawrence* is in a coralline formation, or that it is eligible for inclusion in the National Register. Accordingly, in order to show that the ASA applies, the State has the burden of showing by a preponderance of the evidence that the vessel was abandoned, and that it is embedded in the submerged lands of the State.

Assuming the debris is that of the *Captain Lawrence,* there is no question that most of it is embedded in the submerged lands of the State. Embedded is defined in the ASA as "firmly affixed in the submerged lands ... such that the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck, its cargo, and any part thereof." 43 U.S.C. § 2102(a).

The cultural materials observed were in large part embedded within the bottom sediments. The areas of magnetic declination tend to indicate that additional metal objects may be found under the surface. Moreover, Plaintiff sought a permit to mechanically dredge 3 to 12 feet in an area the size of a football field. The Court finds no issue as to embeddedness.

The only real issue for resolution is whether the State has shown by a preponderance of the evidence that the *Captain Lawrence* was abandoned.

The State claims that abandonment can be inferred in this case because the property was not valuable and Behrens made no effort to salvage it. Plaintiff, on the other hand, claims that neither Behrens nor his heirs ever abandoned their interest in the *Captain Lawrence,* and that abandonment cannot be inferred merely from the passage of time.

The term "abandoned" is not defined in the ASA, but the statute makes clear that it applies only to "certain abandoned shipwrecks, which have been deserted and to which the owner has relinquished ownership rights with no retention." 43 U.S.C. § 2101.

▮▮ Under maritime salvage law, "abandonment" is defined as "the act of leaving or deserting such property by those who were in charge of it, without hope on their part of recovering it and without the intention of returning to it." 3A Norris, *Benedict on Admiralty* § 134 (7th ed. 1993).

The ASA's utilization of the term "abandoned" is consistent with the traditional interpretation of that term by courts sitting in admiralty. *Zych v. Unidentified, Wrecked, & Abandoned Vessel Believed to be "SB Seabird",* 811 F.Supp. 1300, 1309 (N.D.Ill.1992), *aff'd,* 19 F.3d 1136 (7th Cir.1994). The legislative history does not evidence a contrary interpretation.[1]

---

1. The House of Representatives Committee on Interior and Insular Affairs noted that the term "abandoned" as used in the Act, "does not require the original owner to actively disclaim title or ownership. The abandonment or relinquishment of ownership rights may be implied or otherwise inferred, as by an owner never asserting any control over or otherwise indicating his

The law is hesitant to find an abandonment, and abandonment must be proved by clear and convincing evidence. *Columbus–America Discovery Group, Inc. v. Atlantic Mutual Ins. Co.*, 974 F.2d 450, 468 (4th Cir.1992), *cert. denied,* 507 U.S. 1000, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993). Abandonment cannot be merely presumed by the passage of time. *Zych v. Unidentified, Wrecked & Abandoned Vessel, Believed to be SB "Lady Elgin"*, 755 F.Supp. 213 (N.D.Ill. 1991), *vacated,* 960 F.2d 665 (7th Cir.), *cert. denied,* 506 U.S. 985, 113 S.Ct. 491, 121 L.Ed.2d 430 (1992). Moreover, abandonment should not be inferred where there has been no realistic opportunity to discover and salvage the property. *Id.* at 216. Abandonment may, however, and often must, be determined on the basis of circumstantial evidence. *Lady Elgin,* 755 F.Supp. at 214.

The *Lady Elgin* was a steamship which sank in Lake Michigan in 1860. The vessel had been lost for over 130 years and the owner had made no effort to recover it. Nevertheless, the court found no abandonment because the technology did not exist to recover the wreck until the 1980's:

> In light, however, of the law's hesitancy to find abandonment and the concomitant requirement that abandonment be supported by strong and convincing evidence, the Court finds that Aetna was not required to engage in efforts to recover the wreck in order to avoid abandoning its interest when such efforts would have had minimal chances for success.

755 F.Supp. at 216.

In *Columbus–America* the Court held that abandonment of the *Central America* could not be presumed due to inaction because it was not technologically feasible to salvage the vessel until recently. *Id.* at 461–68. The *Central America* went down in 1857 and was eventually located 8,000 feet below the surface and 160 miles off shore.

The *Brother Jonathan* sank in 1865 and is resting 250 feet below the surface. In arriving at its conclusion that the State had failed to meet it's burden of showing abandonment, the court noted that the technology did not exist to either find or safely salvage the vessel until recently. In particular, the court noted that scientific advances in the area of sonar and the use of mixed breathing gasses to combat decompression sickness had only recently made it possible to locate and dive for wrecks in deep water. The *Brother Jonathan* was located at 250 feet. 1995 WL 233135 at *8.

Notwithstanding Plaintiff's arguments to the contrary, the circumstances surrounding the wreck of the *Captain Lawrence* bear no resemblance to those of the *Lady Elgin,* the *Columbus–America,* or the *Brother Jonathan.* The *Captain Lawrence* is a relatively recent wreck. It did not sink in deep water. It was stranded on Poverty Island. Assuming the evidence Plaintiff has found is from the *Captain Lawrence,* the vessel is in pieces close to shore in only 40–60 feet of water. It was not technologically unfeasible to locate or to salvage the *Captain Lawrence* in the 1930's. Modern technology was not essential to the recovery of the vessel.

The evidence, although circumstantial, clearly demonstrates Wilfred Behrens' intent to abandon the vessel. He valued the vessel at only $200, had no insurance on it, and wrote it off as a "total loss." Had he wanted to salvage the vessel, the best time would have been immediately after it was stranded on the beach. Yet there is no evidence that he attempted any salvage operations immediately after the wreck. The evidence shows that Behrens was offered assistance from the Coast Guard immediately after the storm, but declined it. The evidence shows that Behrens was an experienced salvager, and continued his salvage diving for over ten years after the shipwreck. Yet there is no evidence that he ever attempted to salvage the *Captain Lawrence* in the years after the wreck.

Behrens did not discuss the location of the *Captain Lawrence* with his family. He died intestate. He did not leave his interest in

claim of possession of the shipwreck." H.R.Rep. No. 100–514(I), 100th Cong., 2d Sess., *reprinted* *in* 1988 U.S.C.C.A.N. 365, 366.

the vessel to his family or to anyone else. There is no evidence that his crew showed any interest in returning to the *Captain Lawrence.* Behrens' family did not seek out salvage divers to help locate the remains of the *Captain Lawrence.* They showed no interest in finding the *Captain Lawrence* until Libert told them of the possibility of a link between the *Captain Lawrence* and the legendary gold treasure.

The Court finds that the State has met its burden of showing by a preponderance of the evidence that the *Captain Lawrence* was abandoned by Wilfred Behrens. Because the State has met its burden of showing that it has a colorable claim of interest in the vessel, this Court concludes that the Eleventh Amendment bars this court from adjudicating the State's rights in this vessel, and that this action must be dismissed for lack of jurisdiction.

An order consistent with this opinion will be entered.

### *ORDER OF DISMISSAL*

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Intervenor State of Michigan's motion to dismiss for lack of jurisdiction (Docket # 22) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff Fairport International Exploration, Inc.'s motion for order appointing special process server (Docket # 3), motion for preliminary injunction (Docket # 4), and motion for order appointing substitute custodian (Docket # 5), are **DENIED.**

**IT IS FURTHER ORDERED** that this action is **DISMISSED** in its entirety.