## FAIRPORT INTERNATIONAL EXPLORATION, INC., Plaintiff,

v.

**The SHIPWRECKED VESSEL, known as The Captain Lawrence, which sank in 1933, her engines, tackle, appurtenances and cargo located within two nautical miles of a point at coordinates 45 degrees 32 minutes North Latitude and 86 degrees 40 minutes West Longitude, Defendant.**

No. 2:94–CV–164.

United States District Court,
W.D. Michigan,
·Northern Division.

Nov. 2, 1999.

---

4. Of course, this conclusion is almost indistinguishable from a conclusion that the statute is clear.

Roger W. Boer, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, MI, Roger W. Kangas, Casselman & Kangas, PC, Marquette, MI, Peter E. Hess, Peter E. Hess Law Offices, Wilmington, DE, for Fairport International Exploration, Inc., plaintiff.

Fairport International Exploration, Inc., Chantilly, VA, plaintiff pro se.

Stephen F. Schuesler, Jennifer M. Granholm, Attorney General, Natural Resources Division, Lansing, MI, for Plaintiffs.

## OPINION

ROBERT HOLMES BELL, District Judge.

This action was remanded by the Sixth Circuit Court of Appeals for a determination as to whether clear and convincing evidence shows abandonment of the Captain Lawrence. *Fairport Int'l Exploration, Inc. v. The Shipwrecked Vessel, known as the Captain Lawrence*, 177 F.3d 491, 501 (6th Cir.1999) ("*Fairport III*").

## I.

Plaintiff Fairport International Exploration, Inc. initiated this admiralty in rem action in 1994 to establish its right to salvage The Captain Lawrence, a shipwrecked vessel, which sank in Lake Michigan in 1933. The State of Michigan intervened in the action under the Abandoned Shipwreck Act of 1987 ("ASA"), 43 U.S.C. §§ 2101–2106, claiming that the vessel was an abandoned shipwreck embedded in State lands and accordingly belonged to the State. The State moved to dismiss for lack of jurisdiction.

This Court, following the rule applied in *Deep Sea Research, Inc. v. The Brother Jonathan*, 883 F.Supp. 1343 (N.D.Cal. 1995), *aff'd*, 102 F.3d 379, *aff'd in part, vac. in part*, 523 U.S. 491, 118 S.Ct. 1464, 149 L.Ed.2d 626 (1998), required the State to prove abandonment by a preponderance of the evidence in order to show that it had a colorable claim to the vessel. *Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel known as The Captain Lawrence*, 913 F.Supp. 552, 555 (W.D.Mich.1995) ("*Fairport I*"). Following an evidentiary hearing, this Court determined that the State of Michigan had shown abandonment by a preponderance of the evidence, and that the Court was accordingly prevented under the Eleventh Amendment from exercising jurisdiction over the dispute. *Id.* at 559.

The United States Court of Appeals for the Sixth Circuit affirmed, *see Fairport Int'l Exploration, Inc. v. Shipwrecked Ves-

*sel,* 105 F.3d 1078 (6th Cir.1997) (*"Fairport II "*), *vacated,* 523 U.S. 1091, 118 S.Ct. 1558, 140 L.Ed.2d 790 (1998), but the Supreme Court vacated that decision and remanded the case to the Sixth Circuit for further consideration in light of the Supreme Court's ruling in *California v. Deep Sea Research, Inc.,* 523 U.S. 491, 118 S.Ct. 1464, 149 L.Ed.2d 626 (1998).

On remand, the Sixth Circuit noted that the Supreme Court's opinion in *Deep Sea Research* definitively instructs that if a State does not possess a shipwreck, the Eleventh Amendment does not prevent a federal court from entertaining a claim under the ASA to the shipwreck. *Fairport III,* 177 F.3d at 497. Thus, this Court does have jurisdiction to entertain the competing claims of Fairport and the State to the shipwreck. The Sixth Circuit remanded the case to this Court for complete adjudication of the competing claims to the Captain Lawrence. *Id.* at 498.[1]

The Sixth Circuit provided guidance to this Court in its consideration of two issues: the means of proving abandonment, and the burden of proof placed upon Michigan. First, the Sixth Circuit held that a State may prove by inference that a shipwreck last owned by a private party is "abandoned," for the purposes of admiralty law and the ASA. 177 F.3d at 500. The Sixth Circuit clarified that neither lapse of time nor an owner's failure to return to a shipwreck site, standing alone, will necessarily establish abandonment. Nevertheless, these are factors to be considered, along with the place of the shipwreck and the actions and conduct of the parties having ownership rights in the vessel. *Id.* at

500 (quoting *Moyer v. Wrecked and Abandoned Vessel, known as Andrea Doria,* 836 F.Supp. 1099, 1105 (D.N.J.1993)).

Second, the Sixth Circuit held that when the state seeks to establish title under the ASA it must prove abandonment with clear and convincing evidence. 177 F.3d at 501. The Sixth Circuit directed this Court to "reexamine, and supplement if necessary, the evidence adduced in earlier proceedings" on the issue of abandonment under the exacting standard of clear and convincing evidence. *Id.* The Sixth Circuit also instructed that the Court should conduct its abandonment inquiry in light of the "conflicting evidence regarding whether Behrens had access to the technology necessary to salvage the ship, the lack of evidence concerning whether Behrens ever returned to Poverty Island, and the testimony regarding Behrens's intention to return." *Id.*

## II.

This Court has now had an opportunity to review the record of the evidentiary hearing.[2] The Court does not require supplementation of the record. In the order scheduling the original evidentiary hearing, this Court required the State to carry the burden of proof on the issue of abandonment by a preponderance of evidence. Because the State was held to a lower standard of proof at the evidentiary hearing, Plaintiff had a strong incentive to make its best case on the issue of abandonment at the time of the original hearing. Because the State is now being held to a higher burden of proof, Plaintiff has no greater incentive on review than it had at

---

1. The Sixth Circuit directed as follows:
   When the district court revisits this case on remand, it will not conduct a threshold inquiry to determine whether Michigan has a colorable claim under the ASA. Instead, it will decide whether Behrens abandoned the shipwreck; if he did, the ASA vests title in Michigan. If he did not, the ASA does not apply. Michigan may prove abandonment by circumstantial evidence, see supra, but Michigan must prove with clear and con-

   vincing evidence that Behrens abandoned the ship.
   177 F.3d at 500.

2. After entry of the Sixth Circuit's May 13, 1999, opinion in *Fairport III,* Intervenor–Appellee State of Michigan filed a motion for rehearing. The motion was denied on June 23, 1999, and the mandate was issued on July 6, 1999. The record was not returned to this Court, however, until October 19, 1999.

the initial evidentiary hearing to bring forward evidence in support of its position of non-abandonment. The Court does not believe a second evidentiary hearing is necessary to protect Plaintiff's interests.[3] Plaintiff's motion to set hearing will accordingly be denied.

■ Upon review of the record under the clear and convincing evidentiary standard, this Court is satisfied that the evidence already produced on the issue of abandonment is more than sufficient to support a finding that Captain Behrens abandoned his interest in the Captain Lawrence, even under the elevated and relatively stringent clear and convincing evidentiary standard.

In arriving at this determination this Court incorporates all of the findings contained in this Court's opinion in *Fairport I:*

> The Captain Lawrence is a relatively recent wreck. It did not sink in deep water. It was stranded on Poverty Island. Assuming the evidence Plaintiff has found is from the Captain Lawrence, the vessel is in pieces close to shore in only 40–60 feet of water. It was not technologically unfeasible to locate or to salvage the Captain Lawrence in the 1930's. Modern technology was not essential to the recovery of the vessel.

> The evidence, although circumstantial, clearly demonstrates Wilfred Behrens' intent to abandon the vessel. He valued the vessel at only $200, had no insurance on it, and wrote it off as a "total loss." Had he wanted to salvage the vessel, the best time would have been immediately after it was stranded on the beach. Yet there is no evidence that he attempted any salvage operations immediately after the wreck. The evidence shows that Behrens was offered assistance from the Coast Guard immediately after the storm, but declined it. The evidence shows that Behrens was an experienced salvager, and continued his salvage diving for over ten years after the shipwreck. Yet there is no evidence that he ever attempted to salvage the Captain Lawrence in the years after the wreck.

> Behrens did not discuss the location of the Captain Lawrence with his family. He died intestate. He did not leave his interest in the vessel to his family or to anyone else. There is no evidence that his crew showed any interest in returning to the Captain Lawrence. Behrens' family did not seek out salvage divers to help locate the remains of the Captain Lawrence. They showed no interest in finding the Captain Lawrence until Libert told them of the possibility of a link between the Captain Lawrence and the legendary gold treasure.

913 F.Supp. at 558–59.

After reviewing the record, and in response to the issues raised by the Sixth Circuit, the Court makes the following additional findings.

In *Fairport III* the Sixth Circuit referenced conflicting evidence regarding whether Behrens had access to the technology necessary to salvage the vessel.

This Court is not persuaded that a lack of technology presented any barrier to Behrens' ability to salvage the Captain Lawrence. Behrens reported in the Report of Casualty that the Captain Lawrence was stranded when a wind came up and threw the vessel onto the beach. Steven Libert, president of Fairport, testified that portions of the wreckage, including a door, were found on Poverty Island. (T–221). There is also evidence that the vessel was pounded to pieces. To the extent that portions of the vessel sank in the water, the testimony revealed that the wreckage allegedly associated with the Captain Lawrence is in 40 to 60 feet of water along the north coast of Poverty Island. (T 37–38, 208).

Although evidence was presented that SCUBA was not invented until World War

---

**3.** Because the Court finds the evidence sufficient to enter a ruling in favor of the State, the State is not being injured by the lack of a new opportunity to present evidence.

II, that it did not become common or widespread in the U.S. until the 1950s, (T–86), and that Behrens was not a SCUBA diver, SCUBA would not have been necessary to salvage the vessel. Behrens continued to engage in salvaging operations after the destruction of the Captain Lawrence, so there is no dispute that he had access to the marine salvaging technology that was available at that time. Behrens dove with a hard hat, a heavy suit, and lead boots, and breathed through a hose which supplied air from the surface. There appears to be no dispute that a hard hat diver could have engaged in salvaging operations at depths of 40–60 feet. Moreover, the wreckage would not have been so widely scattered before the winter storms and the lapse of some 60 years.

The only feasibility issue raised at the evidentiary hearing was one of visibility. There was evidence that walking on the bottom in lead boots would have stirred up the silty lake bottom and brought visibility close to zero. (T–172). Although salvaging might have been more difficult in the days before SCUBA, the Court does not find that Behrens lacked access to the technology necessary to salvage the vessel.

There was no evidence that Behrens ever returned to Poverty Island to attempt to salvage the Captain Lawrence, or to even evaluate the feasibility of salvaging the vessel. Behrens' daughter, Gladys Nally, testified that her father went up north a lot, and that he went up to northern Lake Michigan after 1933, but she did not know what he did up there. (T–158–59).

Gladys Nally testified that her father was never able to get enough money together to get a ship that was worthy of the waters up around Poverty Island. (T–169). In this regard, the Court notes that Poverty Island is not located out in the middle of Lake Michigan. It is in a chain of islands, stretching south from the Garden Peninsula of Michigan to the Door Peninsula of Wisconsin, and could be easily accessed from Michigan or Wisconsin.

Moreover, there was always the option of boat rental. Evidence was introduced that in 1936 a salvage diver who dove in the area of Poverty Island, was charging $60 per day for diving, $10 per day for days he could not dive, and $40 per day for rental of a commercial fishing boat, and a share in the find.

Finally, the Sixth Circuit requested this Court to consider the testimony regarding Behrens' intention to return to Poverty Island.

The only evidence that even hints of an intent to return to the Captain Lawrence is the testimony of Behrens' daughters, Alice Bergmans and Gladys Nally. Alice Bergmans testified that she recalled her father discussing the subject of sunken treasure or looking for salvage. "That's all he ever talked about." (T–47). "[H]e mentioned his boat, the *Captain Lawrence,* and he was trying to finance it so he could go back and perhaps repair it or do something to do it." (T–47). In response to the direct question of whether Behrens expressed an interest in returning or looking for the wreckage, Bergmans relied on her own imprecise speculations. "I don't think he ever gave up the thought of it because he was trying to get money to do it, and I don't think he ever gave it up because he always talked about his boat and stuff." (T–48). Bergmans testified that Behrens was trying to raise some money to go back to upper Michigan, but he did not ever specify where he was going. (T–49). She was asked whether he discussed returning to the site of the Captain Lawrence. "I think that's where he did go to try to make arrangements and everything, but it was the money that he had to get his crew together and everything." (49–50). Bergmans explained that she was very young when he would talk about this. Moreover, at the time the Captain Lawrence was wrecked Behrens was divorced from Alice Bergman's mother. Alice Bergmans was no longer living with her father, and he was a father that was always gone. (T–50).

According to Gladys Nally, Behrens continued to be involved in salvage diving for at least 10–12 years after the Captain Lawrence was wrecked. He was only doing river salvaging because the boat he was salvage diving off of at the time could not be taken upon the lake. (T–169). After the mid–1940's she did not know whether he continued to dive because he and her mother, Elsie Behrens, were separated, and eventually divorced, and Gladys no longer knew exactly what he was doing. (T–168).

The testimony of Alice Bergmans and Gladys Nally on the issue of Behrens' intent to return to Captain Lawrence is based on very old and incomplete memories. What the daughters do recall is, at best, vague and ambiguous. Their testimony weaves together their father's interest in salvage diving in upper Lake Michigan with his interest in the Captain Lawrence. It is not clear from the testimony whether they are recalling their father's desire to engage in salvaging in upper Lake Michigan in general, or specifically to return to the Captain Lawrence. Alice Bergmans' testimony that Behrens indicated an intent to repair the Captain Lawrence is based upon sheer speculation. It appears that Bergmans has jumped from recollections of her father's fond descriptions of the Captain Lawrence to a conclusion that he intended to repair it.

The Court also views the daughters' testimony with some skepticism in light of its self-serving nature. The family members assigned whatever rights they may have had in the Captain Lawrence to Gladys Nally, who assigned her interests to Fairport in a Salvage Bill of Sale. Pursuant to the Salvage Bill of Sale, the family was to receive 20% in kind distribution of the property salvaged from the shipwreck and two percent in kind distribution of any artifacts recovered from within an injuncted area in the vicinity of the Captain Lawrence. (T–159). After years of disinterest and silence, the daughters' current recollections are undoubtedly colored by the potential of receiving some memento from their father.

All of the documentary evidence and Behrens' own actions are consistent and support only one inference, i.e., that he intended to abandon the vessel. Behrens described the vessel as a "total loss" on the Record of Casualty. The vessel was not insured. Behrens stated that there was no cargo, and he estimated the value of the vessel, without regard to what may be covered by insurance or expense incurred in floating the vessel, at $200. Behrens declined the assistance offered by the Coast Guard the day after the wreck. A newspaper photograph of the Captain Lawrence in Gladys Nally's mother's possession had the caption "Schooner Pounded to Pieces," and a notation in handwriting, "Bill's boat before it was wrecked off Poverty Island." (T 161–62). Based upon the credible evidence, the conclusion is unavoidable that Behrens abandoned the Captain Lawrence as a total loss.

A suggestion has been made that Behrens might have purposely understated the value of his vessel and its cargo in order to dissuade others from trying to salvage it. This is pure speculation, and it also conflicts with the evidence. Behrens purchased the vessel a year and a half previously for $150. A comparable-sized vessel was selling new at the time for $14,500. (T 102). Valuing the vessel at $200 clearly suggests that the actual value of a boat in a state of disrepair and in rather poor condition. (T 103). There is no evidence that either Behrens or any of his crew members made any attempt to salvage the boat or its cargo.

■ As the Sixth Circuit established in *Fairport III*, a claimant may prove abandonment by inference as well as by express deed. 177 F.3d at 499. Indeed, abandonment will rarely be supported by express deed. As Chris Shafer, Chief of the Great Lakes Shoreline Section in the Lakes and Water Management Division of the Department of Natural Resources tes-

tified, it is fairly unusual to see an active disclaimer of abandonment. Active disclaimers are generally limited to those circumstances where the owner of the vessel seeks to avoid potential liability for a hazard to navigation. (T–145).

This Court has carefully analyzed the evidence, and concludes that the evidence of Behrens' intent to abandon the vessel is overwhelming and easily meets the clear and convincing evidentiary standard.

Because this Court has found abandonment by clear and convincing evidence, the ASA vests title of the Captain Lawrence in the State of Michigan. The State's motion to dismiss Plaintiff's admiralty in rem action will accordingly be granted, and this case will be dismissed in its entirety.