11-1644-cv
Northeast Research, LLC v. One Shipwrecked Vessel

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2012

(Submitted: December 10, 2012        Decided: September 5, 2013)

No. 11-1644-cv

_____

NORTHEAST RESEARCH, LLC
*Plaintiff-Appellant*,


-v.-


ONE SHIPWRECKED VESSEL, HER TACKLE, EQUIPMENT, APPURTENANCES AND
CARGO LOCATED WITHIN TWO NAUTICAL MILES OF A CIRCLE WITH THE CENTER
POINT AT THE COORDINATES 42 DEGREES 33 MINUTES NORTH LATITUDE, AND 79
DEGREES 36 MINUTES WEST LONGITUDE,
*in rem Defendant-Appellee*,


-and-


STATE OF NEW YORK,
*Claimant-Appellee.*

_____

Before:      POOLER, HALL, and LIVINGSTON, *Circuit Judges*.

In this *in rem* admiralty action, Plaintiff-Appellant Northeast Research, LLC ("Northeast") appeals from a judgment of the United States District Court for the Western District of New York (Arcara, *J.*) granting summary judgment to Claimant-Appellee the State of New York ("New York") pursuant to the Abandoned Shipwreck Act ("ASA"), 43 U.S.C. § 2101 *et seq.,* and denying Northeast's salvage claim for its discovery of an historic Lake Erie shipwreck. On appeal, Northeast argues, *inter alia*, that the district court erred in holding that the shipwreck is abandoned within the meaning of the ASA. We conclude that clear and convincing evidence establishes that the shipwreck is abandoned,

vesting title in New York, and that Northeast has raised no material issue of fact to the contrary.  Accordingly, we AFFIRM the judgment of the district court.

PETER E. HESS, Law Office of Peter E. Hess, Wilmington, Delaware, *for Plaintiff-Appellant Northeast Research, LLC*.

FRANK BRADY, Assistant Solicitor General (Of Counsel), NANCY A. SPIEGEL, Senior Assistant Solicitor General, BARBARA D. UNDERWOOD, Solicitor General, *for* ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, Albany, New York, *for Claimant-Appellee the State of New York.*

DAVID J. BEDERMAN, Esq., Atlanta, Georgia, *for Amicus Curiae Odyssey Marine Exploration, Inc.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This action arises from the chill depths of Lake Erie, where lies the intact shipwreck of an early nineteenth century wooden schooner.  In 2004, Plaintiff-Appellant Northeast Research, LLC ("Northeast") filed an *in rem* action in federal court laying claim to the shipwreck under admiralty law as the finder and salvor of the sunken vessel. Claimant-Appellee the State of New York ("New York") intervened, asserting title to the wreck under state law and the Abandoned Shipwreck Act ("ASA," or the "Act"), 43 U.S.C. § 2101 *et seq.*, which vests title to certain abandoned shipwrecks in the state on whose land they rest.

2

On summary judgment, the parties disputed whether, as Northeast proposed, the shipwreck was actually the *General Wayne*, which participated in the Battle of Lake Erie during the War of 1812, or, as New York argued, an abandoned and "nameless 1830s schooner that sank carrying grain." The district court found that the wreck is abandoned, that no material issue has been raised to the contrary, that New York accordingly proved its claim under the ASA, and that Northeast is not entitled to a salvage award. *See Northeast Research, LLC v. One Shipwrecked Vessel*, 790 F. Supp. 2d 56, 64-66 (W.D.N.Y. 2011). On appeal, Northeast seeks review of the district court's holding that New York has title to the wreck pursuant to the ASA, an inquiry that requires this Court to articulate the standard of proof for abandonment under the ASA and whether abandonment of a shipwreck must be express, or may be inferred circumstantially. For the reasons stated below, we conclude that abandonment may be inferred from circumstantial evidence, and we affirm the judgment of the district court on the basis: (1) that the record demonstrates by clear and convincing evidence that the shipwreck is abandoned within the meaning of the ASA; and (2) that Northeast has failed to raise a material dispute of fact on this issue.

**BACKGROUND**

*I. Facts*

In review of the district court's grant of summary judgment to New York, we view the facts in the light most favorable to Northeast. *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011). Accordingly, the following facts, unless otherwise noted, are undisputed or construed in Northeast's favor.

A. *Discovery and Arrest of the Shipwreck*

Richard Kullberg formed Northeast in 2004 for the purpose of searching the bottom of Lake Erie for old shipwrecks. Kullberg, who had purchased a set of GPS coordinates indicating the potential location of Lake Erie wrecks, discovered the Defendant-Res in 2003 while searching for another shipwreck by means of a remote-operated vehicle.[1] Known as the "Dunkirk Schooner" for the nearby port of Dunkirk, New York, the wreck lies at an approximate depth of 170 feet on submerged New York land in the eastern basin of Lake Erie, where the water temperature remains around 37 degrees Fahrenheit. The depth of the freshwater covering the wreck and the cool temperature have combined to preserve the wooden vessel in relatively pristine condition. Northeast avers that its "ultimate goal" is to raise the Dunkirk Schooner and place it on permanent display in a museum on the Buffalo, New York waterfront.

---

[1] Northeast's statement of undisputed facts asserts that Northeast first dived the wreck in the early 1990s, but that assertion is not supported in the record.

On August 6, 2004, Northeast filed the instant *in rem* admiralty action in the Western District of New York, seeking title to the Dunkirk Schooner under the maritime[2] law of finds, or, in the alternative, a salvage award, and requesting a preliminary injunction prohibiting any rival salvors from diving or conducting salvage operations within two nautical miles of the wreck site. Northeast also moved for issuance of a Warrant of Arrest[3] of the shipwreck and to be appointed her Substitute Custodian in place of the U.S. Marshals. The district court granted both motions, directing Northeast to provide public notice of the action and arrest of the shipwreck, and for any person claiming an interest in the Dunkirk Schooner to make an application to the court. In September 2004, New York responded to that call by filing an answer to the complaint asserting that the Dunkirk Schooner is the sole and exclusive property of the State pursuant to the ASA, the Submerged Lands Act, 43 U.S.C. § 1301 *et seq.*, and New York Education Law § 233.

---

[2] Admirality and maritime "are used synonymously today" and we do not depart from this usage. Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* § 1-1 (5th ed. 2011). Traditionally, however, they are distinct terms. "[M]aritime law . . . refer[s] to the entire body of laws, rules, legal concepts and processes that relate to the use of marine resources, ocean commerce, and navigation. Admiralty law . . . is narrower in the sense that it refers only to the private law of navigation and shipping; it is broader in that it covers inland as well as marine waters." *Id.* (emphases omitted and internal footnote).

[3] "In an *in rem* admiralty action, the arrest of a shipwreck is the procedure by which a salvor establishes jurisdiction in federal court." *Great Lakes Exploration Grp., LLC v. Unidentified Wrecked & (for Salvage-Right Purposes), Abandoned SailingVessel*, 522 F.3d 682, 686 (6th Cir. 2008).

*B.      Excavation of the Dunkirk Schooner*

In 2004, following its appointment as custodian of the Dunkirk Schooner, Northeast engaged Kenneth Vrana and Robert Reedy of the Center for Maritime & Underwater Research Management ("CMURM") as the "archaeological team" that would lead the investigation of the Dunkirk Schooner. Vrana, the president of CMURM, is an underwater archaeologist who specializes in the survey and assessment of historic shipwrecks; Reedy is also an underwater archaeologist and experienced diver. Kullberg, Vrana, and Reedy hoped to partner with New York in order to establish the identity of the wreck and avoid an extended legal battle.[4] To that end, Vrana and Reedy prepared a "research design" to guide further archaeological and historical research of the Dunkirk Schooner, a process that included documentation and survey of the site without intrusive testing or excavation. Northeast, through its archaeological team, arranged to store any recovered artifacts at Mercyhurst College in Erie, Pennsylvania. On May 16, 2008, CMURM applied to the New York State Museum, a division of the New York State Education Department, for a permit to collect and excavate archaeological materials at the wreck site. On June 4, 2008, pursuant to New

---

[4] In his deposition, Kullberg explained, "I filed for a museum permit, a [New York Education Law §] 233 permit, so we could work together, so the State of New York would know what I was doing and we could work together, you know, step-by-step, to find out the great history on the shipwreck."

York Education Law § 233,[5] the State granted a permit allowing excavation of the Dunkirk Schooner through August 30, 2008. Eventually, the State extended the permit through September 30, 2008. The permit contained a number of conditions, including that "[i]n the event that human remains are recovered from the shipwreck, the State Museum must be contacted in decision-making related to the removal and/or analysis of these remains."[6]

The primary objective of Northeast's physical investigation of the Dunkirk Schooner was to determine the identity of the ship, which remained a mystery, by taking measurements, excavating its cargo, and collecting artifacts. The

---

[5] New York Education Law § 233 provides in relevant part that "no person shall investigate, excavate, remove, injure, appropriate or destroy any object of archaeological, historical, cultural, social, scientific or paleontological interest situated on, in or under lands owned by the state of New York, without the written permission of the commissioner of education." N.Y. Educ. Law § 233(4).

[6] The permit also required that Northeast prepare and submit a report on the project to the State Museum by November 30, 2008, and that, "[i]f the shipwreck site is ultimately determined by the court to be under the jurisdiction of the State of New York," Northeast enter into a curation agreement with the State Museum for any artifacts recovered. A letter from the New York State Museum approving the permit and detailing conditions included the following disclaimer:

> The approval by the parties to this agreement and any determination by the State with respect to this application shall not prejudice any claim or defense of either party in this litigation but rather is being done as a gesture of good faith within the context of the instant underlying admiralty litigation. Further, any granting of a permit by the State pursuant to this application shall not prejudice or commit either party with respect to the need for, or the denial of, any subsequent applications by Northeast, or with respect to any position of the State with respect to enforcement of its laws.

7

process included "desilting" parts of the wreck, obtaining core samples of the forward hold, and a limited inspection of the after hold. Due to the depth of the wreck, excavating and documenting the Dunkirk Schooner required "technical" diving, "a form of self-contained diving using various mixed gases and requiring special training and experience."

Although Northeast's efforts, including the work of Vrana and Reedy, discovered no identifying marks on the vessel, they did unearth a trove of clues. Core samples from the forward hold yielded a mixture of wheat and barley. The after hold, although not fully excavated, contained hickory nuts. Divers recovered a range of artifacts indicative of daily life aboard a sailing vessel, including ceramic wares, watches, two compasses, lamps, crockery, period furniture, jewelry, book bindings, brass buttons, and coins with dates from 1797 to 1834. Divers working for Northeast — apparently without the knowledge of Vrana and Reedy — also found human bones. Northeast submitted some of these bones to a lab for DNA analysis, which revealed that they mostly likely came from an individual of Caucasian origin.

Toward the end of the summer of 2008, the relationship between Northeast and CMURM hit rough waters, in part as a result of the discovery of the human remains, and Vrana and Reedy took no part in field investigations after August 15, 2008. On October 21, 2008, the State Museum notified Vrana

of alleged violations of the excavation permit, including the recovery of human remains without notification to the State, continued diving by Northeast after the expiration of the permit on September 30, 2008, and the removal of planks from the roof of the Dunkirk Schooner's cabin.[7] Vrana and Reedy eventually submitted a Report of Investigations on the Dunkirk Schooner (the "CMURM Report") to the State, detailing their excavation work through August 30, 2008.

On March 4, 2009, based on an application by the New York State Office of Parks, Recreation and Historic Preservation, the National Park Service deemed the Dunkirk Schooner Site eligible for placement on the National Register of Historic Places.

## II. Procedural History

### A. The Dispute Over the Identity of the Dunkirk Schooner

On July 31, 2009, New York moved for summary judgment on the ground, *inter alia*, that the Dunkirk Schooner is abandoned within the meaning of the ASA such that title automatically vests with the State.[8] Northeast filed a cross-

---

[7] Northeast maintains that other unauthorized divers damaged the shipwreck, and that it took every effort to protect the Dunkirk Schooner from further destruction, including requesting an injunction from the district court (which was denied) and installing mooring blocks so that vessels could tie up without damaging the wreck. Northeast also maintains that it never removed the human bones from the wreck site, but placed them in a "bone bag" on the shipwreck; however, it is undisputed that Northeast sent certain bone fragments to a lab for DNA analysis.

[8] Additionally, New York asserted title to the Dunkirk Schooner under the federal Submerged Lands Act and New York law, and argued that the Eleventh

motion for partial summary judgment on August 4, 2009, disputing New York's claim to title and, in the alternative, requesting a salvage award. The parties' summary judgment arguments and materials in the record, including the CMURM Report and other analyses, focused largely on the issue of abandonment, specifically, whether the Dunkirk Schooner could be positively identified as the *General Wayne*, which Northeast asserted was not abandoned.

Kullberg proposed the *General Wayne*, originally christened the *Caledonia*, as a possible candidate for the identity of the Dunkirk Schooner after he and Northeast's videographer discovered a line drawing of the *Caledonia* in the Erie Maritime Museum. Vrana and Reedy's archival research into the *Caledonia*, as detailed in the CMURM Report, laid bare the following history: Built in 1799 in present-day Windsor, Canada, the *Caledonia* was a merchant vessel for the North West Company and was employed in the fur trade on Lake Erie. When the War of 1812 transformed Lake Erie into a battle front-line, the British armed the *Caledonia* with cannons and deployed her in the attack on Fort Michilimackinac in 1812. She was later captured on the Niagara River and converted into an American warship, and in that guise the *Caledonia* played a role in Commodore Perry's key victory in the Battle of Lake Erie in 1813. By

---

Amendment divested the district court of admiralty jurisdiction over the action, that equity mandated that Northeast's claims should fail as a matter of law, and that sovereign immunity barred Northeast's salvage claim.

1814, an American captain reported that "[t]he *Caledonia* is unseaworthy, from natural decay," and recommended her for sale. Newspaper accounts and a bill of sale show that in 1815, John Dickson and Rufus S. Reid of Erie, Pennsylvania bought the *Caledonia* and retrofitted or rebuilt her, renaming her the *General Wayne*. The last reported mention of the *General Wayne* was in the year 1818. No reliable reports of her sinking or other disposition have surfaced.

In the CMURM Report, Vrana and Reedy discussed four possible historic ships, including the *General Wayne*, that could be the Dunkirk Schooner, but refrained from offering a definite conclusion regarding the identity of the wreck and recommended that further historical and archival research is necessary to positively identify the shipwreck. The CMURM Report does conclude that the Dunkirk Schooner's probable career dated from the 1820s to the 1840s, and that her cargo of hickory nuts and mixed grains was typical of ingredients used in the production of whiskey in distilleries around the Great Lakes in the nineteenth century. During his deposition, Vrana reiterated that he had no opinion "either which way" regarding whether the Dunkirk Schooner is the *General Wayne*.

In support of its motion for summary judgment, New York offered the expert report of Arthur B. Cohn, executive director of the Lake Champlain Maritime Museum. Cohn concluded "with a high degree of confidence" that the Dunkirk Schooner is not the *General Wayne*, but an unidentified merchant

11

vessel built shortly before 1829 and which sank sometime between 1834 and

1844.  He reached this conclusion based in part on the architecture and

measurements of the Dunkirk Schooner, which he found were consistent with

ships built to traverse the Welland Canal, completed in 1829,[9] and inconsistent

with the drawing of the *Caledonia* in the Erie Maritime Museum.[10]  The *General*

*Wayne*, Cohn noted, had a reported length of 56 feet, which is nearly 20 feet

shorter than the length of the shipwreck.

---

[9]  As the CMURM Report explains,

> Maritime commerce between Lake Erie and Lake Ontario during this time period was greatly enhanced by the completion of the Welland Canal in 1829.  However, the dimensions of the Welland Canal also affected the design of vessels by shipwrights in order to take advantage of commercial opportunities between the upper and lower lakes. . . .  The dimensions of the Dunkirk Schooner are less than the dimensions of the [Welland Canal], and therefore, indicate that this vessel could have participated in the Lake Ontario trade after 1829.

[10] Cohn's expert report and the CMURM Report both note that the line drawing of the *Caledonia* in the Erie Maritime Museum is a modern-day rendering by maritime artist Kenneth Atkins in 1997, and was based on secondary sources, identified as the "tonnage reports, Bell draught, [and] proportions of *General Hunter*[, another ship], and pictures."  As Cohn explained, "The rendering is drawn from images of boats contemporary with *Caledonia* to create a reasonable estimation of what a boat of that time period and with those dimensions might have looked like."  Northeast, in order to bolster the reliability of the Atkins drawing as proof of the *Caledonia*'s physical appearance, submitted an affidavit by Peter J. Rindlisbacher, a marine artist specializing in vessels of the Great Lakes,  attesting that Atkins usually sought primary sources as the basis for his drawings and that "Mr. Atkins' renderings . . . of the *CALEDONIA* can be relied upon as highly accurate depictions of the historic vessel."

12

Cohn also offered testimony to support New York's contention that the Dunkirk Schooner was abandoned long ago. Cohn opined that the technology to locate and recover the vessel existed at or about the time of its sinking. He alluded, specifically, to the salvage of the Steamboat *Atlantic*, which sank in about 160 feet of water in Lake Erie in 1852, and was salvaged by hardhat divers working in 1852 and 1855 and descending to 139 feet and 155 feet, respectively. Cohn noted that the Dunkirk Schooner's masts rise to about 100 feet from the surface, making it at least a potential candidate for salvage, and yet there is no evidence that any salvage effort was ever made. Cohn opined, finally, that the schooner's "mixed cargo of grain and hickory nuts would not have provided the economic incentive to drag the lake and attempt to recover the cargo, despite the technological feasibility of that type of effort at the time."

In support of Northeast's assertion that it had found the wreck of the *General Wayne*, Northeast submitted an archaeological site assessment by James Sinclair (the "Sinclair Report").[11] The Sinclair Report concluded that the cumulative physical evidence, including the Dunkirk Schooner's distinctive "fiddlehead" bow, the notched rudder, measurements taken by divers, and other architectural features, "substantiates the fact that the Dunkirk Schooner is none

---

[11] Sinclair holds an M.A. in Historic Maritime Archaeology and is the vice-president of a firm specializing in the "private-public management of shipwreck resources."

other than the storied former warship and Underground Railroad freedom boat, the *CALEDONIA / GENERAL WAYNE*." According to Sinclair, all other theories for the identity of the shipwreck could be scuttled based on inconsistencies with the Dunkirk Schooner. Sinclair also noted that the Dunkirk Schooner's lack of identifying markings would be consistent with the purported use of the *General Wayne* in the smuggling of slaves to freedom. Sinclair reported that the *General Wayne*'s owners, Reid and Dickson, were active in the abolitionist movement and their houses in Erie, Pennsylvania, "feature extensive labyrinths of underground passageways reputedly used to hide fugitive slaves prior to their final journey to freedom in Canada." He speculated that the ship may have been carrying fugitive slaves at the time it sunk.

Northeast also commissioned an opinion paper from Rindlisbacher, the marine artist who specializes in Great Lake vessels, regarding the "likelihood that the Dunkirk wreck is actually the CALEDONIA" based on the shipwreck's "design features, deck fittings and present conditions." Rindlisbacher compared the Dunkirk Schooner with known examples of the design features of ships contemporary to the *Caledonia*, concluding that the shipwreck's "design features, deck fittings and other characteristics . . . are consistent with the supposed appearance of the CALEDONIA to a significant extent," and that nothing had "convincingly exclude[d]" the *Caledonia* as a possible candidate. Rindlisbacher

14

recognized, however, that "[v]ery little" is known about the physical aspects of the historic *Caledonia*, a circumstance which "adds increased difficulty to evaluating whether the present wreck is actually the original CALEDONIA." Rindlisbacher also acknowledged that the "most difficult fact" weighing against identifying the shipwreck as the *General Wayne/Caledonia* is that, assuming that she sank sometime after 1834 (the date of the newest coin on the wreck), she would have been at least 35 years old at her sinking (based on a 1799 launch date), and "[t]he general wisdom is that these early schooners seldom had that long a lifespan." Nevertheless, "if we allow that CALEDONIA was repaired or refurbished at least once and perhaps additionally through her career, and finally foundered in an end-stage barge condition," Rindlisbacher offered, "it is conceivable that she might have been afloat for all those 35 or more years before her loss."

Finally, Northeast located Hannah Reed Mays, one of the descendants of Rufus S. Reid, the *General Wayne*'s co-owner. Northeast obtained from her an assignment to Northeast of her ownership interest in the *General Wayne* (the "Mays Assignment"), which it proffered as additional evidence in support of its claim that the Dunkirk Schooner is not abandoned.[12]

---

[12] The record also contains the affidavit of Nancy Potter, a descendant of John Dickson, affirming that Northeast contacted her and requested that she assign her ownership interest in the *General Wayne* to Northeast, but that she refused to do so.

*B.*     *The District Court's Decision*

In a Report and Recommendation dated May 27, 2010, the magistrate judge (Leslie G. Foschio, *Magistrate Judge*) to whom the case was referred recommended granting New York's motion for summary judgment and denying Northeast's request for a salvage award. *See Northeast Research,* 790 F. Supp. 2d at 66-89 (appending Report and Recommendation). With regard to New York's claim under the ASA, Magistrate Judge Foschio found that "even if the . . . [v]essel is, as [Northeast] urges, the *Caledonia/General Wayne*," *id.* at 81, "clear and convincing evidence in the record establishes an inference of abandonment," *id.* at 80, and thus the State has title to the Dunkirk Schooner.[13]

Northeast filed objections to the Report and Recommendation, and the district court held oral argument on September 9, 2010. *Id.* at 61. On March 25, 2011, the district court issued a Decision and Order finding that New York had established its claim that the Dunkirk Schooner is abandoned and that Northeast had failed to raise a material issue to the contrary, entitling the State to title pursuant to the ASA. The court adopted the Report and Recommendation "to the extent set forth herein," granted the State's motion for summary judgment, and denied Northeast's salvage award request. *Id.* at 66.

---

[13] Magistrate Judge Foschio first determined that the Eleventh Amendment did not divest the court of jurisdiction over the suit, even though New York had a "colorable" claim to the shipwreck. 790 F. Supp. 2d at 74-76.

16

In reaching these conclusions, the district court identified a purported split among circuit courts regarding whether abandonment under the ASA must be proved by express relinquishment of title or may be inferred from surrounding circumstances, and decided to adopt an inferential standard for proving abandonment. *Id.* at 63-64. The court also agreed with the magistrate judge that abandonment must be shown by clear and convincing evidence, rather than a preponderance of the evidence. *Id.* at 64. The district court referenced Cohn's opinion that the technology to salvage the vessel has existed since 1850 and noted that Northeast had "provided no evidence to support" its assertion that the Dunkirk Schooner could not have been discovered, much less salvaged, without the advent of modern technology. *Id.* at 65. "Moreover," the district court continued, "even if a salvage operation would have been unsuccessful, as plaintiff contends, there is no evidence that any salvage effort was attempted." *Id.* The court determined that the Mays Assignment was insufficient to create a material dispute on the issue of abandonment, particularly as no evidence demonstrated any effort by descendants "to locate the vessel in the 150 years since its sinking." *Id.* at 66. "In sum," the district court held,

> the passage of over 150 years since the sinking of the vessel along with the absence of any effort to locate or salvage the vessel by the owners or their de[scendants] despite the existence of technology to do so demonstrates an intent to abandon by clear and convincing evidence.

*Id.*

This appeal followed.

DISCUSSION

On appeal, Northeast argues that the district court erred in granting New York's motion for summary judgment. Northeast principally asserts that, in finding that the Dunkirk Schooner is abandoned, the district court failed to apply the proper burden of proof, made impermissible factual findings, and failed to draw reasonable inferences in favor of Northeast.[14] We address each of these arguments in turn.

## A.    *Standard of Review*

We review *de novo* a district court's grant of summary judgment, "construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks

---

[14] Northeast spends a considerable portion of its brief arguing that, under *California v. Deep Sea Research, Inc.*, 523 U.S. 491 (1998), because New York does not have actual possession of the Dunkirk Schooner, the state cannot have its ownership claim adjudicated until Northeast completes its salvage operations. This argument holds no water. *Deep Sea Research* held only that the Eleventh Amendment does not bar federal jurisdiction over an *in rem* admiralty action so long as the state does not have actual possession (as opposed to constructive possession) of the *res* to which it claims ownership. *Id.* at 507-08; *see also Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel* (*Fairport III*), 177 F.3d 491, 497 (6th Cir. 1999) (*Deep Sea Research* "definitively instructs us that, if a State does not possess a shipwreck, the Eleventh Amendment does not prevent a federal court from entertaining claims under the ASA to the shipwreck."). We agree with the district court that the Eleventh Amendment does not bar the exercise of jurisdiction here — an argument that New York has, in any event, abandoned on appeal. We also conclude, however, that Northeast's reliance on *Deep Sea Research* is misplaced, as *Deep Sea Research* did not discuss and does not clarify a salvor's rights, if any, in the absence of a state's actual possession of the wreck.

omitted). "[W]e affirm only where we are able to conclude . . . that 'there is no genuine issue of dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

B.    *The Abandoned Shipwreck Act*

The ASA provides in relevant part that the United States asserts title to any abandoned shipwreck that is:

> **(1)** embedded in submerged lands of a State;
> **(2)** embedded in coralline formations protected by a State on submerged lands of a State; or
> **(3)** on submerged lands of a State and is included in or determined eligible for inclusion in the National Register [of Historic Places].

43 U.S.C. § 2105(a). If a shipwreck qualifies as property of the United States under § 2105(a), the ASA automatically transfers title to the state "in or on whose submerged lands the shipwreck is located." *Id.* § 2105(c). Thus, "[f]or a state to acquire title to a shipwreck [under the ASA] it must be (1) abandoned and (2) on or embedded in the submerged lands of a state." *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 640 (4th Cir. 2000). As it is undisputed that the Dunkirk Schooner is a wreck embedded in the submerged lands of New York, this case turns on whether a material issue of fact exists as to its abandonment.

19

The ASA displaces the maritime law of salvage and the law of finds that otherwise govern shipwrecks not falling within the Act's terms. *See* 43 U.S.C. § 2106(a) ("The law of salvage and the law of finds shall not apply to abandoned shipwrecks to which section 2105 of this title applies."); *Great Lakes Exploration Grp., LLC v. Unidentified Wrecked & (For Salvage-Right Purposes), Abandoned Sailing Vessel*, 522 F.3d 682, 688 (6th Cir. 2008). Although "there appears to be no clear line of demarcation between property that is 'salvaged' and 'finds,'" *Adams v. Unione Mediterranea Di Sicurta*, 220 F.3d 659, 670 (5th Cir. 2000) (internal quotation marks and alterations omitted), traditionally, courts have applied the law of salvage when the original owner of a ship or cargo lost at sea retains an ownership interest in the property — albeit also granting a "very liberal" award to the salvor for its recovery of the *res*.[15] *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 459 (4th Cir. 1992); Thomas J. Schoenbaum, 2 *Admiralty and Maritime Law* § 16.7 (5th ed. 2011); *cf. Int'l Aircraft Recovery, L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1258 (11th Cir. 2000) ("The law of salvage generally governs efforts to save vessels in distress. Under the law of salvage, rescuers take possession of, but not title to, the distressed vessel and its contents."). Conversely, the law

---

[15] Technically, "[b]y performing a voluntary and successful [salvage] act, the salvor obtains a maritime lien on the salved property, which he can enforce in rem in an admiralty court." *Adams*, 220 F.3d at 670 (internal quotation marks omitted).

of finds vests title to property that is abandoned, or which has never been owned, in the finder. *See Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked & Abandoned Steam Vessel*, 833 F.2d 1059, 1065 (1st Cir. 1987) (applying "the ancient and honorable principle of 'finders, keepers,'" to steam vessel the *Republic,* "given the passage of so many decades" since its sinking); *cf. Columbus-Am. Discovery Grp.*, 974 F.2d at 460 (noting that "[a] relatively recent trend in the law . . . has seen the law of finds applied to long lost and abandoned shipwrecks"). But since the ASA, where applicable, precludes application of both the law of salvage and finds, "[i]f a diver now discovers a long-lost ship embedded in the submerged lands of a State, a finding of abandonment leaves the diver with neither title nor a salvage award." *Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel* (*Fairport III*), 177 F.3d 491, 498 (6th Cir. 1999).

In enacting the ASA, Congress sought to preserve and protect abandoned, embedded and historic shipwrecks by entrusting states with their management and encouraging states to develop sound policies for: (1) the protection of natural resources and habitat associated with such wrecks; (2) the guarantee of recreational exploration of shipwreck sites; and (3) the appropriate recovery of wrecks so as to protect historical values and the integrity of the shipwrecks and

21

their sites. *See* 43 U.S.C. §§ 2101, 2103.[16] The ASA does not prohibit the activities of commercial salvors but rather encourages states to regulate "private sector recovery of shipwrecks consistent with the protection of historical values and environmental integrity of the shipwrecks." 43 U.S.C. § 2103(a). The Act reflects Congress's judgment, however, that states are the best guardians of abandoned wrecks of historical significance found in their waters (and of other abandoned shipwrecks embedded in state lands), and that a policy of settling ownership of such shipwrecks with states promotes the best interests of the public. *See Zych v. Unidentified, Wrecked & Abandoned Vessel, Believed to Be*

---

[16] The ASA's "Congressional statement of findings" provides:

**(a)** States have the responsibility for management of a broad range of living and nonliving resources in State waters and submerged lands; and **(b)** included in the range of resources are certain abandoned shipwrecks, which have been deserted and to which the owner has relinquished ownership rights with no retention.

43 U.S.C. § 2101. Moreover, the ASA states that

[I]t is the declared policy of the Congress that States carry out their responsibilities under this chapter to develop appropriate and consistent policies so as to —
    **(A)** protect natural resources and habitat areas;
    **(B)** guarantee recreational exploration of shipwreck sites; and
    **(C)** allow for appropriate public and private sector recovery of shipwrecks consistent with the protection of historical values and environmental integrity of the shipwrecks and the sites.

*Id.* § 2103(a) ("Access rights"). In that vein, "States are encouraged to create underwater parks or areas to provide additional protection for such resources." *Id.* § 2103(b) ("Parks and protected areas").

*the "Seabird,"* 19 F.3d 1136, 1140 (7th Cir. 1994) ("Congress passed the ASA to clear up any confusion over who owns certain abandoned shipwrecks.").

*1. Abandonment under the ASA*

Northeast concedes that the Dunkirk Schooner is a historically significant shipwreck embedded in the submerged lands of New York, but disputes that it is "abandoned" within the meaning of the Act. As Magistrate Judge Foschio succinctly explained, "[i]f . . . the Dunkirk Schooner is not abandoned, then neither the ASA nor the maritime law of finds applies, and although title would vest in neither North[e]ast nor New York, [Northeast] could be granted a salvage award." *Northeast Research*, 790 F. Supp. 2d at 78. If the wreck is abandoned, then it belongs to New York pursuant to the ASA.

The ASA does not define the term "abandoned." However, the Supreme Court has stated that "the meaning of 'abandoned' under the ASA conforms with its meaning under admiralty law." *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 508 (1998). In admiralty cases, courts do not assume that ship owners have abandoned their vessels simply because the vessels have wrecked. *See Dluhos v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 74 (2d Cir. 1998). Rather, courts employ an "assumption of nonabandonment," anchored on the "realistic premise that property previously owned but lost at sea has been taken involuntarily out of the owner's possession and control by the

23

forces of nature at work in oceans and waterways." *Columbus-Am. Discovery Grp.*, 974 F.2d at 460-61 (quoting *Hener v. United States*, 525 F. Supp. 350, 356-57 (S.D.N.Y. 1981)); *see Fairport III*, 177 F.3d at 498 ("Intent on protecting the property rights of owners, admiralty courts recognize a presumption against finding abandonment."). Thus, abandonment under admiralty law "means much more than merely leaving the property, for it has long been the law that when articles are lost at sea the title of the owner in them remains." *Columbus-Am. Discovery Grp.*, 974 F.2d at 461 (internal quotation marks and alteration omitted).

As a consequence of the presumption against abandonment, courts in this Circuit and elsewhere have traditionally imposed a stringent burden of proof of abandonment in the admiralty context. *See, e.g.*, *The C.P. Minch*, 73 F. 859, 865 (2d Cir. 1896) (holding that circumstances must show abandonment of a vessel was "absolute, without hope or expectation of recovery"); *Adams*, 220 F.3d at 671; *Trueman v. Historic Steamtug New York*, 120 F. Supp. 2d 228, 233 (N.D.N.Y. 2000); Schoenbaum, 2 *Admiralty and Maritime Law* § 16-7 (stating that application of law of finds "requires strong proof" that the property was lost). Those circuits that have decided the issue, moreover, have adopted a heightened "clear and convincing evidence" standard for states attempting to prove abandonment under the ASA. *See Fairport III*, 177 F.3d at 500-01

(holding that state must prove abandonment by clear and convincing evidence); *Sea Hunt*, 221 F.3d at 644 (same). We agree that the clear and convincing "burden of proof accords with maritime law and with the protection of private property rights against appropriation by the state," *Fairport III*, 177 F.3d at 501, and therefore hold that abandonment for ASA purposes must be shown by clear and convincing evidence by the party arguing for abandonment — the state.

We also agree with the district court that abandonment pursuant to the ASA need not be proved by express or explicit statements of intent to abandon, but rather may be inferred from circumstantial evidence (provided such evidence is sufficiently strong as to satisfy the clear and convincing burden). Although the district court identified a circuit split regarding inferential abandonment under the ASA, those Circuits that have broached the subject in fact agree on the following: that for ships last owned by a private party, abandonment may be inferred from circumstantial evidence in appropriate cases, at least when there is no owner presently claiming an interest in the vessel.[17] *Compare Fairport III*,

_____

[17] The Sixth Circuit limited its holding in *Fairport III* to shipwrecks last owned by a private party and "express[ed] no view" as to whether express abandonment is required as to "vessels initially owned by the United States." *Fairport III*, 177 F.3d at 500. *See also Sea Hunt*, 221 F.3d at 643 (applying express abandonment test in context of *in rem* action against two Spanish ships claimed by Spain). We similarly limit our holding and analysis.

177 F.3d at 500 (holding that "a State may prove by inference that a shipwreck last owned by a private party is 'abandoned'"), *and Deep Sea Research, Inc. v. Brother Jonathan*, 89 F.3d 680, 688 (9th Cir. 1996), *vacated on other grounds by California v. Deep Sea Research*, 523 U.S. 496 (1998) (applying "traditional approach" to abandonment that "allows abandonment to be inferred on the basis of circumstantial evidence"), *with Sea Hunt,* 221 F.3d at 641 (noting that "[a]n inference of abandonment is permitted, but only when no owner appears").

This approach comports with the treatment of abandonment in admiralty cases. Indeed, even before enactment of the ASA, courts applying traditional admiralty principles had begun to reject the notion that "[d]isposition of a wrecked vessel whose very location has been lost for centuries" must proceed "as though its owner were still in existence." *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 569 F.2d 330, 337 (5th Cir. 1978). *See Martha's Vineyard Scuba Headquarters,* 833 F.2d at 1065 (applying law of finds to long-lost ship without requiring express abandonment); *Dluhos*, 162 F.3d at 74 (recognizing trend away from legal fiction "under which an owner . . . retains title" to a ship that has "rested for centuries under fathoms of open ocean"). As the Ninth Circuit has observed:

> Traditionally, maritime law has found abandonment when title to a vessel has been affirmatively renounced, or when circumstances give rise to an inference that the vessel has been abandoned; courts

have found abandonment, for instance, when a vessel is "so long lost that time can be presumed to have eroded any realistic claim of original title."

*Deep Sea Research*, 89 F.3d at 688 (quoting *Martha's Vineyard Scuba Headquarters*, 833 F.2d at 1065). Requiring express abandonment in all ASA cases would be inconsistent with these admiralty cases and, as the Sixth Circuit has observed, would "render the ASA a virtual nullity," since "such explicit action is obviously rare indeed," *Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel Known as the Captain Lawrence* (*Fairport II*), 105 F.3d 1078, 1085 (6th Cir. 1997), *vacated on other grounds by* 523 U.S. 1091 (1998).

In determining whether clear and convincing circumstantial evidence supports inferring abandonment, courts consider a variety of factors, including lapse of time, the location and circumstances of the wreck, whether parties presently claim ownership, whether such parties have attempted to locate or salvage the vessel, and the availability of technology to do so. While mere non-use and lapse of time alone may not be enough to establish abandonment, "a combination of several facts, proved clearly and convincingly, . . . may support a finding than an owner has abandoned a shipwreck." *Fairport III*, 177 F.3d at 500; *see also Trueman*, 120 F. Supp. 2d at 234; *Moyer v. Wrecked & Abandoned Vessel, Known as The Andrea Doria*, 836 F. Supp. 1099, 1105 (D.N.J. 1993) ("Factors such as lapse of time and nonuse by the owner may give rise to an

inference of intent to abandon. Other factors include the place of the shipwreck as well as the actions and conduct of the parties having ownership rights in the vessel." (citations omitted)). For example, an owner's failure to salvage a vessel despite the availability of technology to do so may support an inference that the owner has abandoned his property, while the technical infeasibility of salvage may deprive the owner's inaction of evidentiary significance. *Compare Zych v. Unidentified, Wrecked & Abandoned Vessel Believed to be the "SB Lady Elgin"*, 755 F. Supp. 213, 216 (N.D. Ill. 1991) (finding that insurance company "was not required to engage in efforts to recover the wreck in order to avoid abandoning its interest when such efforts would have minimal chances for success" due to lack of enabling technology) *with Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel* (*Fairport IV*), 72 F. Supp. 2d 795, 798-801 (W.D. Mich. 1999) (inferring abandonment based in part on evidence of failure to attempt salvage despite technological feasibility), *and Moyer*, 836 F. Supp. at 1105 (insurer's "failure to engage in salvage efforts" not excused where technology to salvage the wreck was available shortly after its sinking).

For obvious reasons, discovering the identity of a vessel, if ascertainable, is helpful in determining whether it is abandoned. *See Fathom Exploration L.L.C. v. Unidentified Shipwrecked Vessel or Vessels*, 857 F. Supp. 2d 1269, 1272-73 n.4 (S.D. Ala. 2012) (in suit involving claims under the ASA, noting that "the

identity of Shipwreck #1 is of vital importance to the parties' underlying claims and rights in this matter"). But it does not follow that a shipwreck *must* be positively identified in order to adjudicate a state's claim to title under the ASA. *See id.* at 1279 (provisionally identifying shipwreck as British barque the *Amstel* for purposes of determining whether it was abandoned pursuant to the ASA even absent any " hard evidence" to support that theory as the "definitive truth"); *cf. Klein v. Unidentified Wrecked & Abandoned Sailing Vessel*, 758 F.2d 1511, 1514 (11th Cir. 1985) (in pre-ASA case, applying law of finds to determine ownership of unidentified shipwreck); *Smith v. Abandoned Vessel*, 610 F. Supp. 2d 739, 754 (S.D. Tex. 2009) (inferring that unidentified and potentially nonexistent vessel was abandoned). Common sense suggests that in some circumstances, especially in the case of old and ancient wrecks, "100% certainty as to the vessel's identity is not possible," even after "untold hours of laborious research[.]" *Fathom Exploration*, 857 F. Supp. 2d at 1272 n.4. Imposing such a requirement (which, at any rate, is not to be found in the text of the ASA) would thus undermine the statute by condemning some wrecks and the artifacts associated with them to a watery limbo, vulnerable to further deterioration and destruction. Thus, although ascertaining the identity of a vessel is certainly helpful in making the determination whether the vessel has been abandoned, this is not a precondition for determining abandonment under the ASA.

*C.    The Dunkirk Schooner is Abandoned under the ASA*

The question before this Court is whether the district court erred in determining that New York established its case by clear and convincing evidence, and that Northeast failed to raise a material issue of fact as to whether the Dunkirk Schooner is abandoned.  We conclude that the district court did not err in granting summary judgment to New York.  There are admittedly questions of fact regarding the identity of the Dunkirk Schooner — questions that Lake Erie has perhaps permanently obscured.  But in this case, the district court properly determined that this mystery need not impede adjudication of title to the shipwreck.

In reviewing the grant of summary judgment to New York, we view the evidence in the light most favorable to Northeast and assume that the Dunkirk Schooner is the War of 1812 battleship the *General Wayne,* née *Caledonia.*  Even so, New York has demonstrated abandonment by clear and convincing evidence: there were no efforts to locate the wreck for over 150 years; *General Wayne*'s poor working condition and spoilable contents strongly call into question the economic worth of the vessel and the then-owners' continued interest in recovery; and the alleged owners' descendants have no proof of their ownership of the vessel, further suggesting abandonment by the original owners.  We

therefore uphold the district court's conclusion that the Dunkirk Schooner was abandoned.

Proceeding on the assumption that Northeast discovered the wreck of the *General Wayne*, the following undisputed facts emerge: Originally built in 1799, the *Caledonia*, a wooden schooner, sank sometime after 1833 with some unfortunate souls on board. This means that she was at least 34 years old when she sank and, as Northeast's own evidence suggests, nearing the end of her expected lifespan even if she was retrofitted in 1815, after her purchase by Dickson and Reid.[18] At the time of her disaster, the hold of the *Caledonia*, renamed the *General Wayne,* contained grain and hickory nuts, which were undoubtedly ruined by the water and rendered valueless. After 1818, moreover, the *General Wayne* disappears from the history books, and there is no record of her sinking. Assuming, then, that the Dunkirk Schooner is the *General Wayne,* she has rested at the bottom of Lake Erie for at least 150 years. And there is no evidence — none — that her former owners Reid and Dickson (or anyone else connected to the ship) ever tried to locate her or took any actions indicative of a continued interest prior to her discovery by Northeast in 2003.

---

[18] Rindlisbacher, Northeast's expert witness, opined that the Dunkirk Schooner was not in a "normal working state" when she sank, since "[h]er stand rigging had been removed, along with essential spars, which do not indicate that she was sailing very effectively prior to her sinking. This is consistent with a ship which, being at the end of her working life, was unable to tolerate the working loads of being under sail."

Pointing to the abolitionist ties of Reid and Dickson and the lack of identifying markings on the Dunkirk Schooner, Northeast speculates that the *General Wayne* was used to ferry fugitive slaves to Canada as part of the Underground Railroad — so that Reid and Dickson had an incentive *not* to attempt to find the vessel containing proof of their illegal activities immediately after it sunk. However, even if we assume that the *General Wayne* was carrying escaped slaves when it wrecked — an inference supported only by Sinclair's bald speculation — that fact still does not support a finding of non-abandonment. While in some circumstances, "lack of overt efforts to claim the ship may comport as much with a concern for secreting [treasure] as with an intent to abandon the ship," such is not the case here. *Fairport III*, 177 F.3d at 501 n.4 (discussing possible intent of ship's owner to return to gold that might lie with the ship). Whereas the "secreting" of treasure is presumably done with the intent to return to the booty and retain a claim to it, a decision to leave the evidence of an illegal act carries no such implication — especially where the evidence, as here, was an old ship and a ruined cargo.

The parties disagree about whether the technology existed to salvage the *General Wayne* after it sank, and whether the Mays Assignment is a legitimate claim of ownership that creates a genuine issue of material fact regarding abandonment. On the issue of technology, we agree with Northeast that the

district court erred in concluding that no issue of fact exists as to whether hardhat divers could have recovered the Dunkirk Schooner beginning in 1852. New York's expert, Cohn, noting that the Dunkirk Schooner's masts rise to about 100 feet from the surface of Lake Erie, based his conclusion that hardhat divers could have salvaged the Dunkirk Schooner near the time of its wreck on his observation that "[o]n Lake Erie the Steamboat *Atlantic* which sank in 160 feet of water in 1852 was salvaged by hardhat divers descending to 139 and 155 feet in 1852 and 1855." However, the record also contains evidence that "technical diving," which relies on modern technology, is required today to reach the wreck. Moreover, the ability of hardhat divers to reach the top of the *General Wayne*'s mast (the ship itself lies at 170 feet) hardly demonstrates the technological feasibility of recovery, let alone a likelihood of successful salvage. *See Zych,* 755 F. Supp. at 216. Based on our review of the record, we therefore conclude that the technological possibility of salvage in the mid-1850s remains a disputed issue.

Nevertheless, even assuming that technological infeasibility barred recovery in the 1850s, the Dunkirk Schooner remained undisturbed for 150 years thereafter, despite advances in deep-water salvage in the intervening years. *See Columbus-Am. Discovery Grp.*, 974 F.2d at 467 (mentioning "drastic advances in deep water salvage" by the late 1970s). Long past fear of repercussion for

illegally helping fugitive slaves, and long past any time in which deep-water salvage was out of the question, no owner of the *General Wayne*, or any successor in interest, made efforts to locate or recover the wreck. To the extent Northeast relies on the Mays Assignment as a demonstration of continued owner interest, moreover, this applies to Mays as well.

Regarding the Mays Assignment, we conclude, contrary to Northeast's claim, that it creates no genuine issue of material fact necessitating trial on the issue of abandonment. The validity of Mays's ownership claim, and thus of the assignment to Northeast, depends on several significant assumptions: first, that Mays's great-great-great grandfather Rufus Reid did not abandon the *General Wayne* during his lifetime; second, that Reid bequeathed the *General Wayne* to his children (or that title otherwise passed to them) rather than to someone else; third, that title to the *General Wayne* thereafter passed to Reid's descendants; and fourth, that those descendants did not abandon the *General Wayne*. Although Mays's declaration attests to her family lineage and the fact that her ancestor Reid purchased a half-ownership in the *General Wayne* in 1816, it offers no documentary or other proof, *or even personal belief*, that the *General Wayne* remained in the family or that Mays inherited an ownership interest in the ship. Thus, while the assumption that the Dunkirk Schooner is the *General Wayne* has some (albeit limited) support in the record, there is no evidence supporting

any of the assumptions necessary to transform the Mays Assignment into legitimate proof of ownership when faced with 150 years of non-interest. In these circumstances, no reasonable inference against abandonment may be drawn from the Mays Assignment. *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (stating that "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation[]" to defeat a motion for summary judgment).

Considering all of the known factors, the clear and convincing evidence proves that even assuming the Dunkirk Schooner is the *General Wayne*, this ship has rested at the bottom of Lake Erie, utterly forgotten and undisturbed, for at least 150 years. As further circumstantial evidence of abandonment, the *General Wayne*'s hold was filled with spoilable goods and she was nearing the end of her working days. While the lack of technology available to salvage a shipwreck at the time of its disaster might in some cases excuse inaction, that factor does not suffice to create a material dispute of fact necessitating trial here, where the ship has gone undisturbed for such a lengthy period during which no recovery effort was ever made. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

35

*material* fact."); *cf. Fairport Int'l Exploration, Inc. v. The Captain Lawrence* (*Fairport V*), 245 F.3d 857, 863-64 (6th Cir. 2001) (affirming district court's conclusion that state proved abandonment despite evidence of owner's financial inability to return to shipwreck).  The "lapse of time, alone, does not necessarily establish abandonment, and an owner's failure to return to a shipwreck site does not necessarily prove abandonment."  *Fairport III*, 177 F.3d at 499 (citation omitted).  But here, given the surrounding circumstances, the Dunkirk Schooner is a vessel "so long lost that time can be presumed to have eroded away any realistic claim of original title," *Martha's Vineyard Scuba Headquarters*, 833 F.2d at 1065.  Northeast has failed to point to any fact in the record sufficient to create a genuine issue of material fact to the contrary.  *See Scotto*, 143 F.3d at 114 ("[T]he non-movant [opposing a motion for summary judgment] must produce specific facts indicating that a genuine factual issue exists." (internal quotation marks omitted)).  Accordingly, summary judgment was properly granted to New York.

## CONCLUSION

We have considered Northeast's remaining arguments and find them to be without merit. We conclude that dismissing the case on summary judgment was proper because the Dunkirk Schooner is abandoned and title vests in New York pursuant to the ASA. For the foregoing reasons, we **AFFIRM** the judgment of the district court.